JOHN T. PULLEN AND THE RALEIGH SAVINGS BANK v. CORPORATION COMMISSION.

(Filed 11 May, 1910.)

1. **Taxation — Banks — Real and Personal Property — Nontaxable State Bonds.**

   All bank stock is taxable at its value, less the assessed value of the bank's real and personal property, although the capital is invested in North Carolina State bonds.

2. **Taxation—Banks—Surplus—Nontaxable State Bonds — Assessment.**

   So much of the surplus of the bank as is not invested in the nontaxable bonds of the State of North Carolina issued in pur-

suance of the act of the General Assembly of 1909 is to be considered in assessing the value of shares of stock for taxation.

### 3. Same—Exemption.

Under the provision of said act so much of the surplus, over and above capital, as is invested in such nontaxable bonds is exempt and must be deducted from the surplus in assessing the value of the stock for taxation.

CLARK, C. J., and HOKE, J., dissenting.

THIS was a controversy without action submitted to *Guion, J.*, from WAKE, from a judgment adverse to the plaintiffs, filed 19 April, 1910, and they have appealed to this Court.

Omitting the merely formal parts of the submission, the facts agreed to as determining this controversy are thus stated:

1. That the Corporation Commission is a department of the State Government, created by law and charged with certain duties, among which duties is exercising the powers and duties of State Tax Commissioners; that their office is in the city of Raleigh, Wake County, N. C.

2. That the Raleigh Savings Bank and Trust Company is a bank and savings institution, duly created by law, having a capital and a surplus, whose office and place of business is in the city of Raleigh, and that John T. Pullen is a stockholder therein, as shown by the books of the company, and is a citizen of Wake County.

2 (a). That the asylum or 1949 bonds, herein referred to, were sold by the State of North Carolina at a price of 103, the same bearing 4 per cent interest per annum, payable semiannually, and not due until 1 July, 1949, as expressed in said bond, and that said bonds were sold upon the faith of the State, as pledged in the act authorizing their issue. That at the time of such sale the legal rate of interest for money loaned in North Carolina was 6 per cent per annum, all banking institutions being authorized to take interest in advance, and that at the time of such sale the outstanding bonds of the State of North Carolina bearing 4 per cent interest were sold on the financial markets at 102, such sales being below the price brought by the bonds above referred to.

3. That John T. Pullen is interested directly in the assessment of the stock, as the failure to deduct these asylum or 1949 bonds from the surplus in arriving at the assessment of the stock will directly affect to his injury and loss that amount of State, county and city taxes paid by him on said stock.

4. That on 5 March, A. D. 1909, the General Assembly of North Carolina enacted "An act to issue bonds to carry out the act of 1907, for the care of the insane of the State," which act

is known as chapter 510 of the Public Laws of 1909, a copy of which act is hereto attached and marked "Exhibit A," said act reading in section 4 as follows:

"SEC. 4. The said bonds and coupons shall be exempt from all State, county or municipal taxation or assessment, direct or indirect, general or special, whether imposed for purposes of general revenue or otherwise, and the interest paid thereon shall not be subject to taxation as for income, nor shall said bonds and coupons be subject to taxation when constituting a part of the surplus of any bank, trust company or other corporation."

5. That on or about 1 July, 1909, the State of North Carolina, acting through its Governor and State Treasurer, issued five hundred thousand dollars ($500,000) of asylum bonds, now known as 1949 bonds, authorized by the act just above referred to, and sold the same to various parties, both within and without the State of North Carolina.

6. That at the session of the Legislature of 1909, the General Assembly passed the Revenue and Machinery acts, known respectively as chapters 438 and 440, the same regulating the listing and collection of taxes levied and imposed for raising revenue for the State of North Carolina; the said chapter 440, among other things, providing in section 33 (in part), relative to taxation of bank, banking associations or savings institutions, as follows:

"The value of such shares shall be determined as is hereinafter in this section provided. Every bank, banking association or savings institution (whether State or National) shall list its real estate in the county, city or town in which such real estate is located, for the purposes of State, county and municipal taxation. Every such bank, banking association or savings institution shall, during the month of June, list annually with the Corporation Commission, in the name and for its shareholders, all the shares of its capital stock, whether held by residents, or nonresidents, at its market value on the first day of June, or, if it have no market value, then at its actual value on that day, from which market or actual value shall be deducted the assessed value of the real and personal property which such bank, banking association or savings institution shall have listed for taxation in the county or counties where such real and personal estate is located. The actual value of such shares, where such shares have no market value, shall be ascertained by adding together the capital stock, surplus and undivided profits and deducting therefrom the amount of real and personal property owned by said institution on which it pays tax, and dividing the

net amount by the number of shares in such institution. In-solvent debts due said institution may be deducted from the items of undivided profits or surplus, if itemized and sworn to, and forwarded to the Corporation Commission by the. cashier of such institution. If the Corporation Commission shall have reason to believe that the market or actual value as given in is not its true value, it shall ascertain such true value by such ex-amination and investigations as to it seems proper, and change the value as given in to such amount as it ascertains the true value to be, which action on the part of the Corporation Com-mission may be reviewed by the Superior Court, by an action brought against the Corporation Commission in its official ca-pacity by the party aggrieved."

7. That the Raleigh Savings Bank and Trust Company is a bank and savings institution, having a capital and a surplus, and that a part of said surplus is invested in the bonds issued under Laws 1909, ch. 510, commonly known as the asylum bonds or 1949 bonds, and that it bought the same upon the faith of the State of North Carolina, as pledged in chapter 510 of the Public Laws of 1909, paying for the same out of its sur-plus.

8. That the said Raleigh Savings Bank and Trust Company has made return to the Corporation Commission, as is required in section 33 of the Machinery Act of 1909 (Laws 1909, ch. 440), for the assessing of the shares of stock held by the stock-holders in said corporation, in accordance with law, which said assessment the Corporation Commission is directed to make and certify to the several counties where the stockholders re-side, as the value of said stock for taxation.

9. That the Corporation Commission, in accordance with the statute providing for the assessment of capital stock of banks, have assessed and appraised the value of the shares of stock of the Raleigh Savings Bank and Trust Company by adding to-gether the capital stock, surplus and undivided profits, and de-ducting therefrom the real and personal property owned by said institution, on which it pays tax, and dividing the net amount by the number of shares in said institution. That the said Cor-poration Commission did not deduct from the surplus the asy-lum or 1949 bonds (those authorized by chapter 510 of the Public Laws of 1909) owned by the said Raleigh Savings Bank and Trust Company, they holding that the same was not deduct-ible, as a matter of law, in arriving at this assessment; to which assessment the said Raleigh Savings Bank and Trust Company and John T. Pullen, a stockholder of said company, have ex-cepted and announced their intention of bringing an action

against the Corporation Commission in the Superior Court of Wake County in its official capacity, to review the action of the said Corporation Commission.

10. That a tender of all taxes, admitted by the aggrieved parties to be due, has been made before the submission of this controversy without action.

11. With a view of facilitating the arriving at a determination of the rights of the parties, it has been agreed to present the submission of this case, containing the facts upon which the controversy depends, to the Superior Court of Wake County for its determination and rendition of judgment thereon, as if the action were pending.

The judgment rendered by his Honor, upon the above facts, is as follows:

NORTH CAROLINA—Superior Court.

(*Title of Cause.*)

The court, by consent of parties, having heard argument in this case agreed, is of opinion, and so adjudges, that the ruling of the Corporation Commission herein be and the same is hereby affirmed, and it is adjudged that the $55,000 of surplus invested in these bonds should not be and shall not be deducted in arriving at the value of each share of stock for the purpose of taxation. The plaintiffs will pay the cost hereof. Plaintiffs except. Appeal by the plaintiffs. Bond of $50 adjudged sufficient, on appeal, and the case agreed on, the entire papers in this controversy without action, and this judgment will, by consent, constitute the case on appeal. 19 April, 1910.

The plaintiffs appealed.

*W. H. Pace, A. B. Andrews, Jr.,* and *R. H. Battle & Son* for plaintiffs.
*Aycock & Winston* for defendant.

MANNING, J. The General Assembly of this State, at its session in 1909, authorized (ch. 510, Public Laws 1909) the issue of $500,000 of bonds of the State to pay the expenditure of that sum, authorized by the General Assembly of 1907, for the enlargement of the State institutions for the care of its mental defectives. Section 4 of that act provides: "The said bonds and coupons shall be exempt from all State, county or municipal taxation or assessment, direct or indirect, general or special, whether imposed for purposes of general revenue or otherwise, and the interest paid thereon shall not be subject to taxation as

PULLEN v. CORPORATION COMMISSION.

for income, nor shall said bonds or coupons be subject to taxation when constituting a part of the surplus of any bank, trust company or other corporation."

The uniform and well-settled policy of the State, certainly since 1852—and its power to do so seems never to have been doubted or questioned—has been to exempt its own bonds and certificates of debt from taxation. Laws 1852, ch. 10, sec. 4; Rev. Code, ch. 90, sec. 5; Laws 1879, ch. 98, sec. 3; Code, sec. 3573; Laws 1905, ch. 543, sec. 4; Rev. 1905, secs. 5022, 5031. In the act herein quoted (sec. 4, Laws 1909, ch. 510) this purpose and intent is expressed in language so clear and unambiguous that it can admit of no uncertainty.

The particular inhibition of this section, which is presented for our interpretation, and *which is not found in any preceding act authorizing the issue of State bonds,* is the last clause, in these words: "Nor shall said bonds and coupons be subject to taxation when constituting a part of the surplus of any bank, trust company or other corporation." Omitting these words from the section, it is clear that the bonds and coupons and interest paid thereon are exempted from all State, county or municipal taxation or assessment, direct or indirect, general or special, whether imposed for general revenue or otherwise; and this is true regardless of their ownership, whether by individuals, partnerships, joint-stock associations, or corporations, and whether constituting a part of the capital, surplus or undivided profits of the corporation. In the hands of the owner, and however held, and regardless of what part of his money is invested in them, the State bonds issued under this act are clearly exempted from all taxation, general or special, direct or indirect. This being the clear intent and policy of the State speaking through the legislative department, and exercising a power uniformly recognized and conceded, it is our plain duty to uphold the will of the State and not to be astute to search for ways to evade it.

It is likewise well settled by the language of our State Constitution, by many decisions of this Court, and of the Supreme Court of the United States, and now generally accepted law, that the property of a shareholder of a corporation in its shares of stock is a separate and distinct species of property from the property, whether real, personal or mixed, held and owned by the corporation itself as a legal entity. It would be useless to cite authority to support a proposition so well established and generally accepted. The Constitution, Art. V, sec. 3, commands that: "Laws shall be passed taxing, by a uniform rule, all moneys, credits, investments in bonds, stocks, joint-stock com-

panies, or otherwise; and also all real and personal property according to its true value in money." It is apparent from an examination of the taxing laws of the State, that the legislative department has attempted to observe and enforce the mandate of the Constitution.

In *Comrs. v. Tobacco Co.*, 116 N. C., 441, in discussing the several forms of taxation to which corporations were subject under the Constitution, this Court said: "As to corporations, by all the authorities, it is in the power of the Legislature to lay the following taxes, two or more of them in its discretion at the same time: (1) To tax the franchise (including in this the power to tax, also, the corporate dividends); (2) the capital stock; (3) the real and personal property of the corporation. This tax is imperative and not discretionary under the *ad valorem* feature of the Constitution; (4) the shares of stock in the hands of the stockholder. This is also imperative and not discretionary."

In that case the Court also held that it was competent for the Legislature, in the method adopted by it, to tax the shares of stock in the hands of shareholders, to require the corporation by its proper officer to file a list of the shareholders and the corporation to pay the taxes assessed against the shares of stock, and "this does not affect the liability of the shares to tax as the property of the shareholders, but is simply for the convenience of the State in collecting the tax. The effect is merely to change the *situs* of the shares for taxation from the residence of the owner to the locality where the chief office of the corporation is situated, as was held in *Wiley v. Commissioners,* 111 N. C., 399." In *Home Savings Bank v. Des Moines,* 205 U. S., 503, the Supreme Court of the United States, speaking through *Justice McKenna,* said: "It, however, is not an uncommon, and is an entirely legitimate method of collecting taxes, to require a corporation, as the agent of the shareholders, to pay in the first instance the taxes upon shares, as the property of the owners, and look to the shareholders for reimbursement." The tax in such cases would be a tax upon the shares of stock, and not a tax upon the corporation. It would be a mere method of collecting the tax, and not a change of the subject-matter of taxation.

It is, likewise, within the power of the Legislature, under the Constitution, to prescribe the method by which the value of all property subject to taxation is to be ascertained and determined; and the method prescribed by the Legislature, and which has been prescribed for many years, for fixing the value for taxation of bank shares, is found in ch. 440, sec. 33, Laws

1909, and is as follows: "Every bank, banking association or savings institution (whether State or National) shall list its real estate in the county, city or town in which such real estate is located, for the purpose of State, county and municipal taxation. Every such bank, banking association or savings institution shall, during the month of June, list annually with the Corporation Commission, in the name and for its shareholders, all the shares of its capital stock, whether held by residents or nonresidents, at its market value on the first day of June, or, if it have no market value, then at its actual value on that day, from which market or actual value shall be deducted the assessed value of the real and personal property which such bank, banking association or saving institution shall have listed for taxation in the county or counties wherein such real estate is located. The actual value of such shares, where such shares have no market value, shall be ascertained by adding together the capital stock, surplus and undivided profits, and deducting therefrom the amount of real and personal property owned by said institution on which it pays tax, and dividing the net amount by the number of shares in said institution. Insolvent debts due said institution may be deducted from the items of undivided profits or surplus, if itemized and sworn to, and forwarded to the Corporation Commission by the cashier of such institution." It is further provided that the Commission may, if it desire, make such examination and investigation as it may believe to be advisable to ascertain the market or actual value, and its action may be reviewed by an action, such as the present case is, in the Superior Court.

This has been for many years substantially the method prescribed by the Legislature of the State for ascertaining the taxable value of the shares of stock in banking institutions, whether State or National, and the only change of note was made by the Laws of 1909, in changing the authorities to appraise the stock from the Auditor of the State to the Corporation Commission. In speaking of this section, this Court, in *Lumber Co. v. Smith,* 151 N. C., 70, through *Mr. Justice Hoke,* said: "In the case of banks, their realty is listed in the county, and, on report made as required by this section, the value of the shares is appraised and determined by the Commission, and this, with the sworn list of stockholders, is certified by the commissioners to the county authorities, to the end that the proper amount may be assessed against the individual holders of the same. This is done in order to conform the taxation of all banks to the method permissible in the case of National banks, and in order to make the taxation equal and uniform throughout the

State on all institutions of that class. There is much to be said in support of the scheme of taxation contained in these statutes, tending, as it does, to uniformity and consistency of rulings on the various and important questions presented, and under an intelligent and conservative administration the law is proving itself to be a satisfactory and workable system. These are matters, however, more properly for legislative considera- tion, and are not dwelt upon, the only question for us being the power of the Legislature to enact the law, and its correct inter- pretation."

It will be observed that, in the section of the Machinery Act under consideration, it is made the duty of the defendant com- mission to deduct from both the market and the actual value of the shares of stock, as ascertained by it, before fixing the taxable value of such shares, the aggregate of the real and personal property listed by the banking institution. The principle of deduction is further recognized in the cases of individuals and corporations, when they come to list their solvent credits, in that from their solvent credits they are authorized to deduct their obligations or debts due by them, and the balance is to be listed as taxable solvent credits. This principle is recognized by the Supreme Court of Illinois as constitutional, in *Loan Assn. v. Keith,* 153 Ill., 609. The Legislature has for many years recognized this as an equitable system of taxation; it has been incorporated for more than twenty-five years in our system of taxation, and this notwithstanding that it has been well settled by repeated decisions of this and other courts that shares of stock are, in the hands of the shareholder, separate and dis- tinct property from the property of the corporation.

The fairness and justness of the principle of deductions in the method of ascertaining the taxable value of the subjects of taxation, in order to avoid the essential harshness and inequity of double taxation, was, we think, distinctly sanctioned as long ago as 1882, in *R. R. v. Comrs. of Wake,* 87 N. C., 414. That case was presented to this Court on appeal by both parties from the judgment of the Superior Court, and in delivering the unan- imous opinion of the Court, *Chief Justice Smith,* as pertinent to the present matter, said: "The commissioners object fur- ther that the assessed value of the preferred stock should be reduced by the value of the real estate and franchise as taxed separately in the several counties traversed by the road. The ruling of the Court in directing the reduction is obviously made to avoid the imposition of a double tax, since the value of all property owned by a corporation, in whatever consisting, and including the franchise, is the true and fair measure of the

value of all its stock, and hence the General Assembly permits stockholders, in valuing their shares, to 'deduct their ratable proportion of tax paid by the corporation upon its property as such in this State.' Sec. 8, par. 6. The section leaves it somewhat uncertain whether the value of stock is to be reduced by the value of corporate property taxed, and the tax levied upon the difference, or the tax upon the former is to be abated to the extent of the tax upon the latter; but we interpret the latter to be the meaning. The effect of the ruling of the Court is to deprive the counties through which the road passes of assessments of the corporate property in each, and transfer them to the county of Wake, while it is, in our opinion, the purpose of the statute to allow the taxpaying shareholder to deduct from the tax on his shares a ratable part of the tax paid upon the corporate property elsewhere by the corporation itself, but not to withdraw from taxation in other counties such property of the corporation therein as is liable to assessment and taxation."

Again, in *R. R. v. Comrs. of Alamance,* 91 N. C., 454, this Court said again, speaking through the Chief Justice, interpreting chapter 117, Laws 1881, sec. 8: "In the concluding clause, amended by the act of 1883, ch. 363, sec. 8, to remove the obscurity pointed out in *R. R. v. Comrs. of Wake,* 87 N. C., 426, it is provided that 'stockholders in valuing their shares may deduct their ratable proportion of the value of taxable property, the tax whereof is paid by the corporation.' "

The power of the Legislature to authorize deductions to be made by the taxpayer in the method it has prescribed for ascertaining the taxable value of some of the subjects of taxations has been continuously exercised under the interpretation of the Constitution by this Court in the cases cited above.

If the reason moving the Legislature to concede a deduction was based upon a desire to avoid apparently double taxation, and this was a legitimate exercise of its discretion, we cannot see why it could not be moved to exercise a similar discretion in favor of a species of property which the fixed policy of the State, for more than half a century, has been to exempt from taxation, which the Legislature by its act in 1909 has, in the most unequivocal terms, forbidden to be taxed by the State, county, city or town, generally or specially, directly or indirectly. This inhibition of taxation can only be of advantage to the State's own citizens and corporations; to the stranger it can be of no advantage, as, living beyond the territorial limits of the State, he is beyond the reach of its taxing power.

The State and its taxpayers are not without compensating advantage for this exemption from taxation conferred upon the

bonds issued by the State, because it is thereby enabled to sell its bonds, bearing interest at only 4 per cent, not only at their par value, but at a premium, and thus if residents and citizens of the State—those liable to pay it tribute in taxes—own the bonds of the State, what the State and its taxing subdivisions, created by it, may lose in revenue by permitting the bonds to be taxed, is saved by the State and its taxpayers in having to pay a much reduced rate of interest on the bonds.

The only remaining question, presented by the argument and arising upon the record, to be determined by us, is: Does the act authorize the deduction of these bonds to be made when constituting a part of the surplus of any bank, trust company or other corporation? Does this plainly appear to be the meaning of the act and the legislative intent?

The settled rule of statutory construction is that a statute should be construed with reference to the intended scope and purpose of the Legislature, and in order to ascertain the purpose, the courts must give effect to all of its clauses and provisions unless to do so would violate the provisions of the fundamental law or produce irreconcilable conflicts in the statute itself; nor will the use of inapt, inaccurate or improper terms or phrases invalidate a statute, when the real meaning of the Legislature can be gathered from the context or from the general purpose and tenor of the enactment. *Spencer v. R. R.,* 137 N. C., 119; *Fortune v. Commissioners,* 140 N. C., 322; *Board of Education v. Commissioners,* 137 N. C., 63; Black on Interpretation of Laws, 56. It is also said in Mordecai's Law Lectures, p. 22: "The construction given to a statute by the executive officers of the Government contemporaneously with its passage is entitled to great weight with the courts."

It appears from the public records of the State that for many years prior to 1909, and while the Auditor of the State was the authority authorized to ascertain and appraise the value of stock in banking institutions, he deducted, under the advice of the law officer of the State, the State bonds held by the banks from their total assets. Some doubt was suggested as to the validity of this uniform practice of the Auditor's office. The Legislature, in enacting the act now under consideration, added to section 4 these words: "Nor shall said bonds and coupons be subject to taxation when constituting a part of the surplus of any bank, trust company or other corporation." This same language will also be found in sec. 4, ch. 399, Laws 1909, being the act "to authorize the issue of State bonds to pay off the State bonds which fall due on the first day of July, 1910." These words will be found in no other act authorizing the issue

of State bonds. We must assume that these acts of such public importance, affecting the credit of the State and authorizing the issue of its bonds, received the careful examination and scrutiny of the General Assembly; and that provisions incorporated in them not found in other similar acts could not pass unobserved and would not have been adopted unless they expressed some new and distinct legislative intent. The acts were required by the Constitution and were passed with distinct formality. The bills had to be read on three several days in each branch of the General Assembly and on the second and third readings the ayes and noes were recorded, as required, on the journals of each house.

In Laws 1905, ch. 543, sec. 5, in the legislation authorizing the issue of bonds in settlement of the South Dakota judgment and the Schafer bonds, the only language used is, "Said bonds shall be exempt from all taxation, including income tax." The language used in other acts authorizing the issue of State bonds will be found in sections 5022 and 5031, Rev. 1905. In using the language in the act now under consideration there must have been, as hereinbefore observed, some distinct legislative intent, and we think this will be found in the Machinery Act. The fact that the property exempt from taxation is made exempt by another act different from the Machinery Act does not support the argument that it is not exempt from taxation; nor does the fact that the Machinery Act in terms does not authorize the bonds to be deducted, support the argument that it was not the legislative intent to have them deducted; for in section 32, ch. 440, Laws 1909, that section which specifies what property the taxpayer shall list for taxation, and calls specifically for the listing of the amount of credits, there is no reference whatever to State bonds or other bonds of the State's subdivisions that are legally exempt from taxation. To ascertain this exemption the taxpayer and the tax lister must each look elsewhere, to other acts whose provisions will be considered *in pari materia. Wilson v. Jordan,* 124 N. C., 683, and cases cited in Annotated Reports.

Looking to and examining the Machinery Act, we find that the only connection in which the word "surplus" is used is in ascertaining the taxable value of shares of stock in a corporation, whether the entire tax is to be paid by the corporation for its shareholder or in part by the shareholder himself. This is true not only of the act of 1909, but of all previous acts extending over a period of many years, since the Legislature adopted the present method of ascertaining and appraising the shares of stock for taxation. So, then, it seems to us in our scheme of

taxation the word "surplus" has a distinct legal signification, and it must have been used with that signification in the act now under review by the legislative branch of the Government, which has created and established our taxing system, and which alone has the power to do so. Unless we so interpret the statute, we shall fail to give any force and effect to this language. This we cannot do, under a well-settled rule of statutory interpretation. These words were not needed in addition to the other clear and unambiguous language of the section to exempt these bonds from taxation as the property of a bank, whether consisting of a part of its capital, surplus or undivided profits; the other words of the section were plenary for this purpose. But it is objected that the Supreme Court of the United States has held in *Bank of Commerce v. Tennessee,* 161 U. S., 134, that the surplus of a bank may be taxed as a distinct species of property; but that decision does not hold that when that surplus consists of nontaxable bonds, it may be taxed. We do not think that case decisive of the present question. The facts presented in it are substantially these: The State of Tennessee in granting a charter to the Bank of Commerce stipulated that "said institution shall have a lien on the stock for debts due it by the stockholders before and in preference to other creditors, except the State for taxes, and shall pay to the State an annual tax of one-half of one per cent on each share of capital stock, which shall be in lieu of all other taxes." Subsequently the State passed an act providing that "the surplus and undivided profits in such bank, banking association, or other corporation shall be assessable to said bank or other corporation, and the same shall not be considered in the assessment of the stock therein." Previous to this act the State had attempted to tax the shareholders upon their shares of stock in addition to the amount provided in the charter above quoted, and in a suit brought to test the validity of this tax, and which suit finally reached the Supreme Court of the United States, as *Farrington v. Tennessee,* 95 U. S., 679, it was held that "the exemption was a contract between the State and the bank limiting the amount of tax on each share of stock, and that a subsequent revenue law of the State which imposed additional taxes on the shares in the hands of the shareholders impaired the obligation of the contract, and was void." In the *Bank of Commerce case, supra,* the Court, in referring to the *Farrington case,* said: "We do not think under the circumstances that we ought to come to a different conclusion upon the question of exemption from that which was arrived at by this Court in the *Farrington case."* And the Court held that the provision of

the bank charter having been construed to be a contract limitation of the power to tax the shares of stock as the property of the shareholder, it would not extend its benefits to exempt the corporate property from taxation, and as the revenue act only taxed the surplus and undivided profits of the corporation, such tax did not impair the obligation of a contract and was within the power of the State; and therefore the State could tax the entire capital, surplus and undivided profits of the bank. We do not think that case authority against our interpretation of the act now under consideration.

The primary purpose of a bank surplus is the accumulation of a sum against which bad debts may be charged, so· that at all times the capital may be kept unimpaired. This is required by the National Banking Act. The only connection in which, as we have observed, the word surplus is used in our taxing system, now established for more than a quarter of a· century, is that it appears in the method prescribed for ascertaining the taxable value of shares of stock. We think, therefore, that it was within the power of the Legislature to authorize a deduction of the bonds issued under the provisions of this particular act of the General Assembly when they constituted a part of the surplus of a banking institution, in ascertaining the taxable value of the. shares of stock, and that the legislative intent to have such deduction made is expressed with sufficient clearness for this Court to discover such intent, especially when this act is construed in connection with section 33, chapter 440, Laws 1909, known as the Machinery Act. By such interpretation we give effect to the legislative intent without disregarding any clause of the act, which we could not do by any other interpretation; and at the same time we give effect to the well-settled policy of our plan of taxation, to tax the shares of stock in banking institutions as a separate and distinct species of property. The deduction of investment in these bonds by a bank can be made only when the bonds constitute a part of the surplus of such institution. If a part or all of the capital stock or undivided profits are invested in these bonds, the claim of the· shareholder for a deduction cannot be sustained, as the language of the act comprehends only the surplus. If all the surplus is invested in these particular bonds, and there are no undivided profits, then the shares of stock would be appraised at not over their par value, subject to the deduction of the value of the real estate and personal property owned by the bank and already taxed. As to the validity of the deduction of the real estate and personal property, no question seems to be raised. If a less amount than the entire surplus is invested in these

152—36

bonds, then the appraisement of the shares of stock for taxation would be correspondingly increased. We do not think that this interpretation of the act in anywise impairs the right of the State, under the consent of Congress given in section 5219 of the Revised Statutes of the United States, to tax the shares of stock in National banking associations; for our interpretation in no way violates either of the two restrictions imposed by that section of the Revised Statutes. We say this much in reference to the effect upon the taxation of the shares in National banks, because the question was suggested on the argument and in the brief of counsel for the defendant.

We conclude, therefore, that the judgment of the Superior Court sustaining the ruling of the Corporation Commission in appraising the stock of the plaintiff Pullen in the Raleigh Savings Bank and Trust Company is erroneous, in that the investment of a part of the surplus by the said bank and trust company in these bonds, known as the asylum bonds, should have been deducted from the aggregate value of the assets of the said bank and trust company in ascertaining and appraising the value of the shares of stock in said corporation for taxation. The judgment is reversed and the cause remanded for further proceeding in accordance with this opinion.

Reversed.

BROWN, J., *concurring:* I agree fully to the views so lucidly and strongly presented in the opinion of the Court by *Mr. Justice Manning.*

I agree, also, that it is well settled that the shares of stock in any corporation, when owned by individuals, are separate and distinct property from the assets of the corporation and may be taxed as such. But it must be conceded that it rests exclusively with the Legislature to determine how and by what method such shares are to be valued for taxation, as much so as to provide a method for valuing lands and all other property.

The right upon the part of a State to exempt its own bonds from all taxation is universally conceded, and when the General Assembly declared expressly that they should not be taxed when constituting a part of the surplus of a bank, it exercised an undoubted power, which heretofore has never been denied to it. It remains only to determine why were such words employed in the statute and what end were they intended to accomplish. That has been clearly demonstrated, I think, in the opinion of the Court.

No such language is contained in any act of Congress relating to National bonds, nor in any of our own statutes here-

tofore, and hence the cases cited are of no value. This new provision introduced in this State no new method of valuing bank stock. It was plainly intended to give legislative sanction to a practice which had been followed here for many years up to 1909.

Under the ruling of the former Attorney-General, the Auditor of the State in assessing the value of bank stock for taxation always deducted from the bank's surplus all North Carolina bonds, because they were nontaxable, and that was the only way under our system of bank taxation of obeying the law and exempting them from taxation.

It is well known that when the General Assembly of 1909 was considering this act for refunding a large part of the State debt, it intended to incorporate in the bill a provision which would make that practice mandatory in the future. Hence that provision was put in the bill and drawn expressly for that purpose, as is generally understood, by the present Attorney-General at the instance of the Committee on Finance.

It is also well known that the same construction we are giving to this statute has been given to it by the present State administration under the opinion of the Attorney-General, and that the bonds were purchased and paid for in reliance upon that construction.

If I were doubtful about the true meaning and purpose of the General Assembly, I should solve it in favor of that construction by which the good faith of the State is maintained. As it is, I have no doubt that the State administration, under the advice of the Attorney-General, has construed the act correctly.

Any other construction, in my opinion, destroys the purpose of the Legislature and converts its language into foolish and meaningless terms, a snare with which to trap the unwary purchaser. The charge that we are exempting bank stock from taxation is without any foundation to support it. As pointed out in the opinion of the Court, such stock cannot possibly escape taxation at its full par value. This, however, is not a matter of such grave importance to the State as we are led to believe.

I have it from the Treasurer of the State, that although for years past our State bonds have invariably been deducted from the surplus of banks in assessing shares of stock for taxation, yet not more than 10 per cent of the State debt has at any time been owned in North Carolina.

I quote *verbatim* from the opinion of the State Treasurer: "At no time has more than 10 per cent of the bonds been held

inside of North Carolina, and I do not think there is any probability in the future of more than that amount being held in the State, and only a part of that by the banks. I do not think this State can absorb four million dollars' worth of 4 per cent securities, but the increased value of a part of these bonds in the State will in my judgment affect the value of the entire issue, as the outside bidders will always regard the value in the home market." This statement from the efficient and experienced Treasurer of the State, Mr. Lacy, shows how utterly groundless is the assertion that the construction we place upon the statute will exempt four millions of property from taxation.

The wisdom and policy of this legislation is not a matter for our consideration. We should not destroy an act of the General Assembly because we do not approve of it. It is for us to declare the law, not make it.

But I am of opinion that this legislation is in line with a wise and enlightened public policy. Our recognized State debt is over seven million dollars, which will not be paid off for many generations to come. The debt will from time to time be refunded and new bonds issued. The wisdom of the General Assembly prompted it to create, if possible, a reliable home market for our bonds, so that the large sums paid out by the State as interest may be kept at home. It therefore offered the stockholders of banks and other corporations of this State an inducement to purchase its bonds by exempting them from taxation when the surplus earnings of the bank over and above its capital shall be invested in them. The stockholders of a bank will not permit its surplus to be invested in these low rate interest bonds if thereby their shares of stock are to be valued for taxation just as high as if the surplus was invested in more productive investments. Therefore it is perfectly manifest to me that the General Assembly intended to provide that in valuing the shares for taxation State bonds must be exempted by deducting them from the surplus.

It is a matter of common knowledge in the financial world that commercial banks do not, as a rule, invest in such bonds. Their deposit accounts are too active and discounting short-time paper is much more lucrative. It is generally the savings institutions that invest their deposits in State bonds.

In the New England and other States, where savings banks are greatly fostered, they have been encouraged to invest their funds in the securities of their own State, not only because such institutions are productive of thrift and prosperity among a people, but because such investments are the safest and best for their depositors' funds.

Such has been the enlightened policy of the statesmen of France, a most thrifty nation, and as a result of which it was enabled, without outside help, to pay off at once the most stupendous fine ever imposed upon a conquered people in the history of the world.

The stockholders of the plaintiff bank, having purchased these bonds, admittedly at a large premium, relying upon the language of the statute and the opinion of the State's officials, are entitled to have them deducted from the surplus in valuing their stock. With perfect deference to others, I think that good faith and fair dealing require it.

CLARK, C. J., *dissenting:* Though much has been said on the argument in regard to this decision affecting the price of State bonds, reference to the complaint and the judgment of the Corporation Commission discloses that the sole purpose of the action, and the only point presented, is as to whether the *stockholders* in a bank which holds State bonds are exempt to the amount of these bonds from the payment of taxes on their individual property—the shares which they buy and sell at will and which is as much their private property (though paying larger profits) as the horses and plows with which the farmer makes his living or the taxed tools which a mechanic uses. When the State issues its bonds, it has never been denied that it can exempt them from taxation by State, county and municipal authorities. This is on the principle that the issuance of bonds is an agency of government. Besides, the State in effect does collect tax by deducting it in the rate of interest which the bonds bear.

The $55,000 of State bonds in this case are owned by the Raleigh Savings Bank and Trust Company and have not paid one cent of tax to the State, county or city, and no one has ever suggested, or does now suggest, that they should. By reason of such exemption from taxation the bank saves some $1,375 annually, which swells to that extent the fund annually available to be divided among its stockholders. Not content with that, the *stockholders* in this case are asking for a second exemption, another $1,375 annually, by again deducting the same $55,000, in assessing the value of their private property, the shares of stock, for taxation. The shareholders do not own these bonds. They are owned by the bank itself, and the bank has been already exempted from taxation on $55,000 on account of the bank's ownership of them.

Nothing is better settled by the uniform decisions of this Court and of the United States Supreme Court than that the

property of a bank and the shares of the stockholder are entirely separate and distinct, and that the taxation, or exemption, of the one is in nowise a taxation or exemption of the other. *Belo v. Commissioners,* 82 N. C., 415; *Commissioners v. Tobacco Co.,* 116 N. C., 446. Indeed, so thoroughly is this principle settled by repeated decisions of the Supreme Court of the United States that in *Shelby Co. v. Bank,* 161 U. S., 140, it is declared that *no one now disputes that they are separate and distinct classes of property.*

In numerous cases in which stockholders in banks, holding United States bonds, have contended that their shares in such bank were exempt from taxation to the extent of such United States bonds and that the value of their bonds should be deducted in assessing the shares of stock for taxation, that Court has uniformly rejected the contention upon the ground that the bonds were the property of the bank and exempt as such, and that the shares were the property of individuals and not entitled to any exemption in assessing their value on account of the bonds so held by the bank. This is the very contention which the plaintiffs are making in this case and which has been rejected whenever presented by the highest Court in the land. *Van Allen v. Assessors,* 3 Wall., 573; *Bradley v. People,* 4 Wall., 459; *Trust Co. v. Lander,* 184 U. S., 111.

In *Commissioners v. Tobacco Co.,* 116 N. C., 447, following the decisions of the Supreme Court of the United States and the previous decisions of this Court, it was said: "The capital stock belongs to the corporation. The shares or certificates of stock are entirely a different matter. They belong to the shareholders individually, and under the Constitution must be taxed *ad valorem* like other property belonging to the holder, independently of the taxation upon the corporation, its franchises, etc."

If it is now held otherwise as to the plaintiffs, shareholders in a bank, as to our State bonds, in this case reversing all previous decisions, we may not only strike from the tax books $4,000,000 in value of shares of stock in State banks, but we may very probably be exempting all National banks from any taxation whatsoever. The State cannot discriminate against United States bonds.

The act before us exempts three classes of property: 1. The bonds themselves are exempt from all taxation, direct or indirect, general or special. 2. The dividends paid on such bonds are not subject to taxation as an income tax. 3. The surplus of any bank, when consisting of such bonds, shall be exempt from taxation. Not a word is said about exempting shares of stock.

The argument that the shares of stock in the plaintiff's bank are nontaxable because their value is due in part to the fact that if the bank was wound up and the surplus divided, the proceeds of such nontaxable bonds, derived from the sale thereof, would be divided among the shareholders, is fallacious because it confounds the surplus, owned, held and controlled by the bank, with the shares of stock, which are owned, held and controlled by individuals. The Corporation Commission is required by law to assess the value of shares of stock in all banks for taxation. When this matter was presented to that body, it assessed the value of the plaintiff's shares of stock at $104.40 per share, and its decision was in the following words:

"In assessing the shares of stock in this bank the Corporation Commission followed the direction of the statute, as it did not appear such shares had a market value, by adding together the capital stock, surplus and undivided profits and deducting therefrom the amount of real and personal property owned by said institution on which it paid taxes, as follows:

| | |
|---|---|
| Capital stock | $15,000.00 |
| Surplus | 60,000.00 |
| Undivided profits | 342.25 |

making a total of $75,342.25, and deducting therefrom the assessed value of real and personal property, as follows:

| | |
|---|---|
| Office furniture | $3,000.00 |
| Commercial National Bank stock | 8,700.00 |
| Fidelity Bank stock | 1,000.00 |

making a total of $12,700, leaving a balance of $62,642.25, which, divided by 600, the number of shares of stock of said bank, ascertained the value of each share to be $104.40, subject to taxation.

"There was no allegation that there was any insolvent debt due this institution.

"This assessment is not satisfactory to John T. Pullen, who owns fourteen shares of stock in this institution. He contends, and the report on which this assessment is based shows, that the bank has a surplus of $60,000, and has invested $55,000 of this surplus in North Carolina State bonds, issued under chapter 512, Laws 1909, and he claims that this amount should also be deducted from the aggregate value of all the shares of stock. In other words, the contention is that, in addition to the assessed value of real and personal property on which the corporation pays taxes, $55,000 should be deducted, because this much of

the surplus of the bank was invested in the above-named bonds.

"The Corporation Commission failed to see the force of this contention, as they were not assessing the capital stock, or surplus, or undivided profits of the bank, but a distinct species of property, to wit, the *shares of stock* of the bank *in the hands of the shareholder*. The bank is not required by law to list any of its property, whether capital stock, surplus, undivided profits or other property, except so much of it as is invested in real estate inside of the State.. And this bank has already had the full exemption from taxation of its North Carolina State bonds. The only property listed by the bank for taxation was office furniture, $3,000; Commercial National Bank stock, $8,700; and Fidelity Bank stock, $1,000, and these amounts were deducted.

"The General Assembly did not intend that the value of the property exempt from taxation which is owned by a corporation should be deducted from the aggregate value of all the shares of stock in said corporation in order to ascertain the value of such shares for taxation, as appears from the plain directions of the statute: 'The value of such shares of stock in the hands of shareholders shall be the market value. If they have no market value, the value shall be ascertained by adding together the capital, surplus and undivided profits and deducting therefrom,' not such property as is exempt from taxation, but 'the amount of real and personal property owned by said institution on which it pays taxes.' See Machinery Act, Laws 1909, ch. 440, sec. 33. There is no conflict between this statute and chapter 512, Laws 1909.

"That the *shares of stock* in the hands of shareholders are a distinct species of property from that owned by the corporation, and that the General Assembly can require it to be taxed at its value, notwithstanding that a part or the whole of the bank's funds are invested in property exempt from taxation, has been held in our courts in *Belo v. Commissioners,* 82 N. C., 415; *Commissioners v. Tobacco Co.,* 116 N. C., 441, and numerous other cases; and by the Supreme Court of the United States in case of *Cleveland Trust Company v. Lander,* 184 U. S., 111, 46 U. S. R. L. Ed., 456. Notwithstanding the number of words used to exempt the same, namely, 'The bonds and coupons shall be exempt from all State, county and municipal taxation or assessment, direct or indirect, general or special, whether imposed for general revenue or otherwise, and the interest paid thereon shall not be subject to taxation as income, nor shall State bonds or coupons be subject to taxation when constituting a part of the surplus of any bank, trust company or other cor-

poration,' we are of the opinion that the same cannot be construed so as to authorize the deduction contended for by the plaintiff, in view of the authorities cited above.

"FRANKLIN McNEILL,
*"Chairman."*

The statute requires that taxation on the *shares of bank stock* in the hands of individual owners shall be laid upon the value of such stock, which valuation shall be reached: (1) Taking the market value of the stock; (2) Deducting the value of the real and personal property of the bank, which has been already taxed; (3) By dividing the remainder thus left by the number of shares. By these processes the Corporation Commission found that the balance was $62,672 and that the shares of stock are worth $104.40 per share. The plaintiffs are seeking, in this case, to deduct $55,000 (on which *its owner,* the bank, has already had exemption), leaving the taxation value of the total shares in this bank for taxation $7,642, being a little more than $12 a share.

It is a matter of universal knowledge that within the last three months a large part of this stock—in fact, more than five-sixths thereof—has been purchased by another bank at $175 per share, or seven times its par value ($25). On the shares for which the purchasers paid $175 it is now asked that assessment for taxation against said purchasers shall be laid at a little more than $12 per share.

The statute law of the State, Laws 1909, ch. 440, sec. 33 (p. 705), provides: "The residents of this State who are shareholders in any bank, banking association or savings institution (whether State or National) shall list their respective shares in the county, city or town, precinct or village where they reside, for the purpose of county, school or municipal taxation. * * * All shares, whether owned by residents or nonresidents, shall be listed at the time for listing taxes. The county commissioners, list takers and other county and municipal officers shall have the same power to enforce the listing of shares of stock in any such bank, banking association or savings institution, whether held by residents or nonresidents, as they have for enforcing the listing of their personal property. The taxation of shares of. any such bank, banking association or corporation, or savings institution, shall not be at a greater rate than is assessed upon any other moneyed capital in the hands of individual citizens, whether such taxation is for State, county, school or municipal purposes." And the next section provides that in assessing the value of the shares of stock the highest price of sales of stock

during the year and the average price of sales of stock during the year shall be taken into consideration. These provisions show that the lawmaking powers are at one with the decisions of the courts in considering that the shares of stock are entirely separate and distinct property from the property held by the bank itself.

The Constitution of the State, Art. V, sec. 3, provides: *"Taxation shall be by uniform rule ad valorem.* Laws shall be passed taxing by uniform rule all moneys, credits, investments in bonds and personal property according to its true value in money." And then follows section 5 of the same article, which authorizes the General Assembly to exempt cemeteries and property held by schools, churches, charities, and the like, and also personal property, not to exceed $300 to each taxpayer.

The statute law of the State, Laws 1909, ch. 440, sec. 63, in accordance with the provisions of the Constitution, provides (p. 725): "The following personal property *and no other* shall be exempt from taxation, State and local." Then follow the exemptions of property, school and charity property and an exemption (p. 726) "not exceeding $25" of wearing apparel, etc., to each taxpayer. And then, to prevent any possible misunderstanding, Laws 1909, ch. 438, sec. 5, repeals all other exemptions of any other kind than that above enumerated which have heretofore been granted. This legislation shows conclusively that there was no intention on the part of the Legislature to extend an exemption to the shares of bank stock held by the plaintiffs. Such property is proverbially the best in the State, and the shareholders of a bank whose stock, by good management and exemption from taxation, has increased in value to "7 for 1," certainly do not own an interest in "an infant industry" requiring a subsidy from the State in the shape of exemption from taxation. Owing to increased demands for public purposes, the Legislature has not felt that the State was able to grant to less prosperous taxpayers the exemption of $300 per head, which it is authorized to do by the Constitution, but restricts the exemption to $25. It is not reasonable to assume that it intended to exempt many thousands of dollars from taxation in the shape of shares in the banks.

As the statute, Laws 1909, ch. 440, sec. 14½ (p. 696), defines the market value as the amount for which property is sold for cash in the ordinary course of dealing, it would seem that the error in the action of the Corporation Commission is in not assessing this property at $175 instead of $104.40, and the shareholders certainly cannot complain, as they have thus, already, received an exemption of $70 per share deducted from the "true value," or a 40 per cent exemption.

PULLEN *v.* CORPORATION COMMISSION.

It was further argued by the plaintiff that, inasmuch as the statute provided that in assessing the value of the shares in the hands of the shareholders, the Corporation Commission should deduct "the real and personal property on which the bank *has paid* taxes," that, *therefore,* the Corporation Commission should also deduct the property on which the bank *has not paid* taxes. It is impossible to adopt this as logic. If the Legislature had meant to do so, it would certainly have said it, and in a simpler way, by saying that "all shares of bank stock shall be exempt from taxation," since that is what it would amount to.

But the Corporation Commission, in this case, have deducted the value of such real and personal property "on which the bank has paid taxes," to wit, $12,700, before arriving at the amount at which the plaintiffs' shares were assessed. Though the point is not presented, it is well to call attention, here and now, to the fact that unless we deny, what all the courts have held, that the shares of stock in the hands of individuals are separate and distinct from the property of the corporation, the exemption in favor of the *shareholders* of the value of the property on which the *bank* has paid taxes is in violation of the provision of the Constitution which forbids exemption, and the State has lost many thousands of dollars in taxation annually by this point not having been considered. It is very clear that one man cannot have an exemption on his property because another man has paid taxes on his own property.

It was contended in the argument, by the plaintiffs' counsel, that the effect of a decision by this Court that the stock in the hands of shareholders would be exempted from taxation to the amount of the State bonds owned by the bank, would create a demand which would take up possibly the whole of the issue of $4,000,000 of bonds. It is no part of the province of a court of justice to render decisions because of the effect, óne way or another, on the financial market in which bonds and stocks are traded for. The questions before us are only, whether the Legislature attempted, and had the power, to exempt the shares of stock in the hands of the shareholders when it provided that "the bonds and coupons shall be exempt from all State, county and municipal taxation or assessment, direct or indirect, general or special, whether imposed for general revenue or otherwise, and the interest paid thereon shall not be subject to taxation as for income, nor shall bonds and coupons be subject to taxation when constituting a part of the surplus of any bank, trust company or other corporation." These bonds have not been subject to any tax, direct or indirect, general or special, either as surplus or in any other way. The exemption is to the *bonds*

and is given to the *owner,* whether an individual or a bank, and when constituting a part of the surplus of the latter.

But it is contended that the word "indirect" should be construed to extend the exemption, not only to the bank which has already had the benefit of exemption, but further to the shareholders. There is no such intimation in the statute. The expression "indirect taxes" is well known, and in this connection it can only mean taxes "direct or indirect, general or special," *on the bonds* themselves in the hands of the owner, to wit, the bank. To give it the construction contended for would give the word "indirect" a construction which has never been placed upon it by any court. A tax on the shares in the hands of the owner cannot possibly be a tax on the property of the bank.

If the plaintiffs' contention is correct, the Legislature has passed an act which has this singular effect: If any individual or corporation other than a bank owns one of these bonds it is exempt from all taxes in the *owner's* hands—a single exemption; but if a bank owns it, as part of its surplus, the shareholders get an exemption to the like amount on their individual property, their shares of stock—a *double exemption* from taxation.

The owner of more than five-sixths of the shares of the Raleigh Savings Bank and Trust Company is another bank, and the only effect of the decision, if rendered in favor of the exemption, would be to increase vastly the value of the shares of stock in the Raleigh Savings Bank and Trust Company, and also the value of the shares of stock in the bank which now holds five-sixths of the shares of the former bank.

The complaint frankly avers the true object of this suit, which is to obtain a coveted and most valuable exemption from taxation of the shares in the hands of the shareholders. It does not aver that the plaintiffs are seeking to benefit the State by raising the value of the State bonds, nor that they are here to advance the interests of the State. They are seeking an exemption of their shares because of State bonds which the bank has already bought, and it is not reasonable to suppose that they should wish to advance the value of State bonds which either bank may hereafter desire to purchase. Counsel for the plaintiffs, however, have contended that such would be the effect. If it is proper for the Court to consider such matter, it may be well to insert here, from the defendant's brief, the answer which they make to the suggestion:

"The capital stock of the plaintiff's bank is $15,000. Its surplus is $60,000. It holds $55,000 of these nontaxable bonds as a part of its surplus. The life of these nontaxable bonds is

forty years. Let us see what would be the result to the State if the law requires the taxing power to deduct these $55,000 of bonds from the actual value of the capital stock of this bank in order finally to ascertain the value of the *shares* of stock therein:

"The total tax rate in Raleigh is about $2.50. Two and one-half per cent of $55,000 equals $1,375. Forty times $1,375, that is to say, the loss of taxes each year, multiplied by the number of years that the bonds run, equals $55,000. So the State in forty years would lose the principal of the bonds; and for what?—to gain one point by way of premium when first sold (record, p. 2). A pretty costly whistle, to be sure! It will be noted that the 'controversy without action' states that by exempting the shares of stock from taxation the premium upon the bonds will be increased one point. Taking, therefore, these $55,000 of bonds as a basis, the State would receive by way of extra premium, if sold with the exemptions contended for, 1 per cent, or $550. But at the end of forty years the State, etc., would lose, as above, $55,000, and under the contention of exemption, if allowed because the tax is not on the shares but on the corporation, all National banks would go scot free of all taxes. And yet we are authorized to state from the Corporation Commission that it is not the financial view of this matter which they would call to the attention of the Court, but the legal phases of the same. We simply contend that a statute which results in such disastrous consequences financially to the State should not be, by the Court, interpreted as contended for by the appellant, unless the meaning of the statute is clear beyond doubt, without inference and without presumption. And we maintain that the plaintiffs have not shown and cannot show that the intention of the Legislature is clear beyond all doubt in respect to this matter."

In reply to that, the plaintiff's counsel subsequently contended that only a very small part of the bonds would be bought by the banks in this State. If so, such a very small demand could not materially affect the price of the bonds. Indeed, the only evidence adduced before the Corporation Commission, that the exemption of the *shares* of stock would affect the price of these bonds, is that of a witness who thought, perhaps, the price would be raised ¾ of 1 per cent. That was only his opinion, and the contrary opinion that the price of the bonds would not be affected at all is probably entertained by a large majority of the bank officials of this State.

Exemption of any property from its fair and just share of public burdens increases the taxation paid by all other property.

Such exemption has, therefore, been expressly prohibited by the State Constitution. Indeed, it may with truth be said that no legislation can be more unjust or more odious. For many years the State contended for the annulment of an exemption from taxation which had been granted to two great railroads in the State. Such grant had been made at a time when railroads were an "infant industry," and the State thought their construction should be encouraged by contribution from the other taxpayers by exempting those railroads from taxation. Besides, at that time there was no provision in the Constitution, as now, forbidding the exemption of any property. Yet the State strongly contended for years that the exemption was unjust and illegal, and finally the repealing act was held valid by this Court in *R. R. v. Allsbrook,* 110 N. C., 137, which opinion was affirmed upon a writ of error by the United States Supreme Court. In that opinion by this Court, 110 N. C., p. 147, it was said, quoting from *Chase, C. J.,* and *Miller* and *Field, JJ.,* in *Washington v. Rouse,* 8 Wall., 441: "We do not believe that any legislative body, sitting under a State Constitution of the usual character, has a right to sell, to give, or to bargain away forever the taxing power of the State. * * * If the Legislature can exempt, in perpetuity, one piece of land, it can exempt all land. It can as well exempt persons as corporations. They go on to say that rich men and rich corporations with the appliances they are known to use, may obtain perpetual exemption 'from taxation and cast the burden of government and the payment of debts on those who are too poor or too honest to buy such immunity'; and they say further, 'with as full respect for the authority of former decisions as belongs, from teaching and habit, to judges trained in the common-law system of jurisprudence, we think that there may be questions touching the powers of legislative bodies which can never be finally closed by the decisions of the courts, and the one we have here considered is of this character.' We are strengthened in this view of the subject by the fact that a series of dissents from this doctrine by some of our predecessors shows that it has never received the full assent of this Court, and referring to those dissents for more elaborate defense of our views, we content ourselves with thus renewing the protest against a doctrine which we think must be finally abandoned."

In the above case we were holding invalid an exemption from taxation granted under a Constitution which did not forbid such exemption, and purely on the ground that the Legislature could not grant an irrevocable exemption. In the present case the exemption is not given by any words which refer to shares of

stock or to shareholders, and is a most far-fetched deduction from the use of the word "indirect," and if it can be construed to convey the meaning the plaintiffs contend, then the exemption is in direct violation of the Constitution of the State.

It has been uniformly held by the United States Supreme Court, by courts of other States, and by this Court, that in respect to corporations "the Legislature can levy any two or more of the following taxes, simultaneously: (1) on the franchise (including dividends); (2) on the capital stock; (3) on the tangible property of the corporation; and (4) on the shares in the hands of the shareholders. *The tax on the two subjects last named is imperative." Commissioners v. Tobacco Co.,* 116 N. C., 441, and cases there cited. That action was brought by an eminent lawyer, now a member of this Court, whose contentions to the above effect were sustained. Notwithstanding that it was there held that a corporation must pay tax on all its property, like every one else, the counsel for defendant says truly that *"not a bank in North Carolina to-day pays one cent of tax to the State, county or town, for franchise tax, income tax, nor any tax whatever upon its capital stock (which taxes are optional with the Legislature), nor upon any of its property (which last tax is imperative by the Constitution), save the tax on its banking house and furniture and the like"* (in this case $12,700), *and even that tax is recouped by unconstitutionally deducting the amount of the property thus taxed from the assessment of the shares against the shareholders.* This is in direct violation of the Constitution. If the farmers, and other citizens and all other corporations, were treated to a like total exemption from all taxation, they, too, would show a great degree of prosperity. Neither railroads, cotton mills nor any corporation, other than banks, are thus practically exempted from all taxation, nor are shareholders in any corporations other than banks authorized to deduct in estimating the value of their shares for taxation the amount of property on which the corporation has paid any tax.

To sum up: "Exemptions from taxation are regarded as in derogation of the sovereign and of the common right, and, therefore, not to be extended beyond the exact and express requirements of the language used, construed *strictissimi juris." R. R. v. Thomas,* 132 U. S., 174. Here there are no words conferring an exemption upon stockholders in the banks, and it requires an ingenious and most unusual interpretation of the words "indirect tax" to confer an exemption upon the plaintiffs.

"Where a doubt arises as to the existence of the exemption, it is to be decided in favor of the State." *Bank v. Tennessee,*

104 U. S., 495. Here it requires an ingenious construction, an unusual one, of a single word to raise a doubt in favor of the exemption.

"The exemption must be clearly stated and will not be inferred from facts which do not irresistibly point to the existence of a contract." Judson on Taxation, sec. 86. There can be no lawful contract of exemption made, even if the Legislature had so intended, because their action would be in violation of the Constitution.

"No claim of exemption from taxation can be sustained unless established beyond all doubt." *R. R. v. Supervisors,* 93 U. S., 595; *R. R. v. Missouri,* 120 U. S., 569. In this case, of the nine judicial officers to whom, under the laws of this State, this matter has been submitted, only three, a bare majority of this Court, considered that such exemption has been granted. The three Corporation Commissioners, the judge of the Superior Court, and two judges of this Court, have a contrary opinion. Surely, the point is not "established *beyond all doubt*"—the test which the Supreme Court of the United States applies.

Such exemptions must be expressed in clear and unambiguous terms. *R. R. v. Allsbrook,* 110 N. C., 158. Can any one claim that such is the case here when neither "shares" nor "shareholders" nor exemption to them are named in the statute, which only refers to exemption of the *bonds* when owned as the surplus of the bank?

The buyers of the bonds, upon the holding of the Court that the shareholders are exempt on their stock, may claim that the decision of this Court is a contract, an exemption of bank shares annexed to the exemption of $4,000,000 of bonds, being a *double exemption,* for forty years, and that such exemption is irrevocable, even though the Legislature should strike out the act, or the Court should hereafter express a contrary opinion, either in another suit or by a rehearing in this case and change of opinion by one member of the Court, as now constituted, or by a change in its personnel. The dissenting opinions will not be without value, for they put the bond buyers upon notice that if the act, as thus construed, is unconstitutional, no valid contract of exemption of shares has been granted. There is nothing in the judgment of the Corporation Commission of which the plaintiffs have a right to complain.

HOKE, J., *dissenting:* I am constrained to differ from the Court in its decision of this case, and the question presented being a matter of importance both to the parties litigant and to the public, I deem it proper that I should state briefly the reasons for my position.

It has been long an accepted principle that shares of stock in a bank, when owned by individuals, are entirely separate and distinct from the corporate property and assets. This was held for law in *Van Allen v. Nolan,* and several other cases of like import, sometimes called the bank tax cases, decided as far back as 1865, and reported in 70 U. S., p. 573. The question there chiefly determined was whether the bonds of the United States Government should be first deducted in estimating the value of shares of stock in the hands of individual owners for the purpose of State taxation, permissible under the Federal statute; and it was held that while the bonds of the Federal Government were exempt from any and all forms of taxation, direct or indirect, yet the shares of stock owned by individuals being an entirely distinct and separate species of property, the Government bonds, though held and owned by the bank, should not be deducted in determining the value of these shares.

In the case referred to, *Associate Justice Nelson,* delivering the opinion, thus states the principle and the reason for it as follows:

"But in addition to this view, the tax on the shares is not a tax on the capital of the bank. The corporation is the legal owner of all the property of the bank, real and personal; and within the powers conferred upon it by the charter, and for the purposes for which it was created, can deal with the corporate property as absolutely as a private individual can deal with his own. This is familiar law, and will be found in every work that may be opened on the subject of corporations.

\*          \*          \*          \*          \*          \*          \*

"The interest of the shareholder entitles him to participate in the net profits earned by the bank in the employment of its capital, during the existence of its charter, in proportion to the number of his shares; and, upon its dissolution or termination, to his proportion of the property that may remain of the corporation after the payment of its debts. This is a distinct, independent interest or property, held by the shareholder like any other property that may belong to him." *Van Allen v. Nolan,* 70 U. S., 573.

While this principle was originally established by a divided Court, it has been since repeatedly affirmed and applied by the Supreme Court of the United States, as in *Bank v. Tennessee,* 161 U. S., 134; *Bank v. Des Moines,* 205 U. S., 518, and many other cases; and has been so long recognized and acted upon by courts and Legislatures that in the impressive language of *Associate Justice Moody,* delivering the opinion in the case last cited, "It has come to be inextricably mingled with all taxing

systems and cannot be disregarded without bringing them into confusion that would be little short of chaos."

The decisions of our own State are equally pronounced in recognition of this principle. *Commissioners v. Tobacco Co.,* 116 N. C., 441; *Belo v. Commissioners,* 82 N. C., 415. In the last case, *Chief Justice Smith,* speaking to this question, said:

"In an able opinion of the author of that valuable work on railways, commenting on the law, he says: 'We here find the clear recognition of this kind of corporate property, taxable to the corporation, and the shares in the hands of the corporators, distinctly defined as a *fourth species of corporate property, taxable only to the owners or holders:* (1) The capital stock; (2) the corporate property; (3) the franchise of the corporation, all of which is taxable to the corporation; and the shares in the capital stock, which are taxable only to the shareholders.' 1 Red. Am. R. Cases, 497.

"A tax on the shares of stockholders in a corporation is a different thing from a tax on the corporation itself, or its stock, and may be laid irrespective of any taxation of the corporation where no contract relations forbid it. Cooley Const. Lim., 169; Field on Corp., 521.

\*        \*        \*        \*        \*        \*        \*

"In *Van Allen v. Assessors,* 3 Wall., 573, it is held that shares in a National bank may be taxed to the holder, although the whole capital is invested in securities of the National Government, which an act of Congress declares to be exempt from taxation by State authority."

This being the doctrine as it now universally prevails, the Revenue Acts of the State establishing the method of taxation applicable to banks provide that the shares of stock of all banks of this State, both State and National, shall be taxed as the property of the individual owners, and for that purpose said shares shall be assessed at their market value, and, if they have no market value, then at their actual value; that this actual value, when there is no market value, shall be ascertained and determined by adding together the capital stock, surplus and undivided profits and deducting therefrom the value of the real and personal property on which it pays tax under local assessment, and insolvent debts, if properly itemized and sworn to, may also be deducted.

It will be noted here that the shares of stock are assessed and taxed, and the deductions are to be made only in determining the value of *these shares* as property of individual owners, and separate and distinct from the property and assets of the bank,

and the only deductions allowed by the law are the real and personal property locally assessed and taxed and insolvent debts.

This, then, being the provision of the law under which the taxes are assessed, the Legislature of 1909 enacted chapter 510, Laws 1909, entitled, "An act to issue bonds, etc., to care for the insane of the State"; and, after providing for such issue to an amount of $500,000, the statute contains the following section:

"SEC. 4. The said bonds and coupons shall be exempt from all State, county or municipal taxation or assessment, direct or indirect, general or special, whether imposed for purposes of general revenue or otherwise, and the interest paid thereon shall not be subject to taxation as for income, nor shall said bonds and coupons be subject to taxation when constituting a part of the surplus of any bank, trust company or other corporation."

It is contended that under and by virtue of this provision, the bonds to be issued under this act shall not be considered in determining the value of shares in the hands of individual owners for purposes of taxation under the revenue laws above referred to.

This being a claim for exemption from taxation, it can only be allowed in case the claim is clearly established. *R. R. v. Allsbrook,* 110 N. C., 137; *R. R. v. Missouri,* 120 U. S., 569; *R. R. v. Supervisors,* 93 U. S., 595; Judson on Taxation, sec. 86.

In *Allsbrook's case, supra,* it was held:

"2. The grant of an exemption from taxation must be expressed by words too plain to be mistaken; if a doubt arise as to the intent of the Legislature, that doubt must be resolved in favor of the State."

In *R. R. v. Missouri, supra,* it was held:

"Immunity from taxation will not be recognized unless granted in terms too plain to be mistaken."

These decisions, while quoted as indicating the only condition under which an exemption from taxation should ever be allowed, can hardly be considered apposite to the question presented; for, bearing in mind that cardinal principle that shares of stock in the hands of individual owners are entirely distinct from property of the bank, the statute in question nowhere provides that the valuation of these shares, as the property of the individual holders, should be in any way diminished by reason of the ownership of the bonds in question on the part of the banks, nor in my opinion does it use words that justify or permit of any doubt on that question. The section quoted provides:

1. That the bonds shall be exempt from all taxation, direct or indirect, etc.

2. That the interest thereon shall not be subject to taxation as for income.

3. Nor shall they be taxed when constituting a part of the surplus of the bank.

And in language both plain and explicit these are all the exemptions which the statute sanctions or allows. There is nothing obscure or ambiguous in them, and in such case the courts have no power to add what is, to my mind, an entirely distinct provision, to wit: "Nor shall said bonds be considered in determining the value of the shares when assessed and taxed as the property of the individual stockholders."

The first exemption specified in the law, "shall not be subject to taxation, direct or indirect," comes clearly under the decisions referred to, which hold that United States Government bonds shall not be deducted in estimating the value of the shares in National banks for purposes of taxation. An exemption by statute cannot be expressed in terms more comprehensive and searching than that which arises from the principle that the bonds of our National Government may not be taxed by the States. Such a power involves its very existence as an independent sovereignty, and, notwithstanding this, these bonds, when owned by a bank, are not deducted in determining the value of the shares, because, as stated, the shares are an entirely distinct and separate species of property.

The terms of the second exemption in the statute are not relevant to the discussion, and the third, "Nor shall the bonds be taxed when constituting part of the surplus of the bank," in clear and express terms applies to the bonds when constituting part of the corporate property, and in no way affects the valuation of the shares, which are the property of the individual.

It is insisted, in support of the proposed change from the express terms of the law, that unless it shall be interpreted as affecting the valuation of the shares it would be meaningless; and it is further urged that the history of this legislation and the action of the Executive Departments of the State Government should lend force to the position taken in the principal opinion; but these are considerations and rules of construction and interpretation permissible only when the language of a statute is of doubtful meaning, and have no place when its expressions are plain and do not permit of construction.

In Black on Interpretation of Laws, sec. 26, quoted with approval *In re Applicants for License,* 143 N. C., 3, it is said:

"SEC. 26. The meaning of a statute must first be sought in the language of the statute itself.

"And further: 'If the language is plain and free from ambi-

guity and expressed a simple, definite and sensible meaning, that meaning is conclusively presumed to be the meaning which the Legislature intended to convey.'

"And in Lewis' Southerland Statutory Construction (2 Ed.), sec. 267, it is said: 'When the intention of the Legislature is so apparent from the face of the statute that there can be no question as to its meaning, there is no room for construction.'"

In *McCluskey v. Cornwell,* 11 N. Y., 601, *Allen, J.,* quotes with approval the rule as expressed by *Johnson, J.,* in *Newell v. The People,* 3 Selden, 1897, as follows:

"Whether we are considering an agreement between parties, a statute or a constitution, with a view to its interpretation, the thing we are to seek is the thought which it expresses. To ascertain this, the first resort, in all cases, is to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them. If thus regarded the words embody a definite meaning, which involves no absurdity and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed."

And in the same opinion it is said further:

"In the construction both of statutes and contracts, the intent of the framers and parties is to be sought first of all in the words and language employed, and if the words are free from ambiguity or doubt, and express plainly, clearly and distinctly the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation. It is not allowable to interpret what has no need of interpretation, or, when the words have a definite and precise meaning, to go elsewhere in search of conjecture in order to restrict or extend the meaning. Statutes should be read and understood according to the natural and most obvious import of the language, without resorting to subtle and forced construction for the purpose of either limiting or extending their operation."

These views are quoted with approval both in the opinion and dissenting opinions in *Nance v. R. R.,* 149 N. C., 366, and express a well-recognized principle of law. As heretofore stated, there is nothing in the statute which in express terms, or by any permissible intendment, refers to the omission of these bonds in determining the value of shares when taxed as the property of individual holders, and the courts, in my opinion, are without power to add such a provision to the law.

Speaking generally to the question presented, *Associate Justice Peckham,* delivering the opinion of the Court in *Bank of Commerce v. Tennessee,* 161 U. S., 146-147, says:

"These cases show the principle upon which is founded the rule that a claim for exemption from taxation must be clearly made out. Taxes being the sole means by which sovereignties can maintain their existence, any claim on the part of any one to be exempt from the full payment of his share of taxes on any portion of his property must on that account be clearly defined and founded upon plain language. There must be no doubt or ambiguity in the language used upon which the claim to the exemption is founded. It has been said that a well-founded doubt is fatal to the claim; no application will be indulged in for the purpose of construing the language used as giving the claim for exemption, where such claim is not founded upon the plain and clearly expressed intention of the taxing power.

"The capital stock of a corporation and the shares into which such stock may be divided and held by individual shareholders are two distinct pieces of property. The capital stock and the shares of stock in the hands of the shareholders may both be taxed, and it is not double taxation. *Van Allen v. Assessors,* 3 Wall., 573; *People v. Commissioners,* 4 Wall., 244, cited in *Farrington v. Tennessee,* 95 U. S., 687.

"This statement has been reiterated many times in various decisions by this Court, and *is not now disputed by any one.*

"The surplus belonging to this bank is 'corporate property,' and is distinct from the capital stock in the hands of the corporation. The exemption, in terms, is upon the payment of an annual tax of one-half of one per cent upon each share of the capital stock, which shall be in lieu of all other taxes. The exemption is not, in our judgment, greater in its scope than the subject of the tax. Recognizing, as we do, that there is a different property in that which is described as capital stock from that which is described as corporate property other than capital stock, and remembering the necessity there is for a clear expression of the intention to exempt before the exemption will be granted, we must hold that the surplus has not been granted exemption by the clause contained in the charter under discussion. The very name of surplus implies a difference. There is capital stock and there is a surplus over, above and beyond the capital stock, which surplus is the property of the bank until it is divided among stockholders."

There is no one who is more jealous for the honor and reputation of this State and its government than the writer. I know full well that it is their desire and fixed purpose to meet every obligation and duty incumbent upon them as an enlightened, progressive and Christian people, and where such pur-

pose has been enacted into law their courts should at all times and under all circumstances be swift to enforce it; but this sentiment, deep as it is, does not permit—on the contrary, it forbids—that in expounding their laws we should depart from fixed principles of interpretation, or read into their statutes an effect and meaning contrary to the clear import of their terms. I am of opinion that the judgment below should be affirmed.