PERRY MARTIN ON BEHALF OF HIMSELF AND ALL OTHERS OF THE SAME OR LIKE CLASS V. NORTH CAROLINA HOUSING CORPORATION, A BODY POLITIC AND CORPORATE, AND WILLIAM L. TURNER, DIRECTOR OF THE DEPARTMENT OF ADMINISTRATION FOR THE STATE OF NORTH CAROLINA, G. ANDREW JONES, JR., STATE BUDGET OFFICER FOR THE STATE OF NORTH CAROLINA, AND GEORGE S. LAMBERT, STATE DISBURSING OFFICER FOR THE STATE OF NORTH CAROLINA

No. 10

(Filed 31 July 1970)

1. **Constitutional Law § 6— legislative powers of General Assembly — public policy**

    The General Assembly is possessed of full legislative powers unless restrained by express constitutional provision or necessary implication therefrom; absent such constitutional restraint, questions as to public policy are for legislative determination.

2. **Statutes § 4— presumption of constitutionality**

    When the constitutionality of a statute is challenged, every presumption is to be indulged in favor of its validity.

3. **Appeal and Error § 3; Statutes § 4— constitutionality of statute — determination by Supreme Court — specific grounds of attack**

    Ordinarily, the Supreme Court will not undertake to determine whether a statute is unconstitutional except with reference to a ground on which it is attacked and definitely drawn into focus by the attacker's pleadings.

4. **Appeal and Error § 4; Constitutional Law §§ 6, 10— N. C. Housing Corporation Act — public policy — judicial review**

Whether the public policy and program established by the North Carolina Housing Corporation Act is wise or unwise is for determination by the General Assembly, it being the function of the Supreme Court in this appeal to determine whether any portion thereof which plaintiff, as a general taxpayer, may challenge is unconstitutional on any ground asserted by him.

5. **Taxation § 7— taxation and appropriation of tax monies for non-public purpose**

The power to appropriate money from the public treasury is subject to the limitation of Article V, § 3 of the North Carolina Constitution that the power of taxation may not be exercised for a non-public purpose.

6. **Constitutional Law § 4— N. C. Housing Corporation Act — taxpayer suit to enjoin use of money appropriated by legislature**

A taxpayer may maintain an action to restrain payment to the North Carolina Housing Corporation and the Corporation from using the amount appropriated out of the General Fund for its use on the ground that the North Carolina Housing Corporation Act is unconstitutional because the Corporation was not created for a public purpose.

7. **Taxation § 7; Constitutional Law § 6— N. C. Housing Corporation — public purpose — legislative powers**

If the North Carolina Housing Corporation was established for a public purpose, the means of executing the project are for the General Assembly to determine.

8. **Taxation § 7— public purpose**

The concept of public purpose expands with the population, economy, scientific knowledge and changing conditions.

9. **Taxation § 7— public purpose**

For a use to be public it must benefit the public in common and not particular persons, interests or estates.

10. **Taxation § 7— public purpose — legislative declaration**

A legislative declaration which asserts in general terms that the statute under consideration is enacted for a public purpose, although entitled to great weight, is not conclusive.

11. **Taxation § 7— public purpose — question of law**

When the facts are determined, what is a public purpose is a question of law for the court.

12. **Statutes § 4— presumption of facts necessary to constitutionality of statute**

If the constitutionality of a statute depends on the existence or nonexistence of certain facts and circumstances, the existence of such

Martin v. Housing Corp.

facts and circumstances will generally be presumed for the purpose of giving validity to the statute unless the evidence is to the contrary or facts judicially known or proved compel otherwise.

13. **Constitutional Law § 11— police power**

The General Assembly, exercising the police power of the State, may legislate for the protection of the public health, safety, morals and general welfare of the people.

14. **Taxation § 7— N. C. Housing Corporation Act — public purpose**

The North Carolina Housing Corporation Act was enacted for a public purpose and the Corporation's authorized activities in assisting in the planning, construction and financing of residences which would not otherwise be available to persons and families of lower income are for a public purpose; consequently, the appropriation of tax revenues for use by the Corporation does not violate Article V, § 3 or Article I, § 17 of the North Carolina Constitution or Section I of the Fourteenth Amendment to the United States Constitution.

15. **Taxation § 6— issuance of bonds and notes by N. C. Housing Corporation — necessity for vote**

Legislation creating the North Carolina Housing Corporation and authorizing the Corporation to issue bonds and notes does not violate Article VII, § 6 of the North Carolina Constitution, which requires the approval of a majority of the voters of a county, city, town or other municipality before such subdivision of the State may pledge its credit or levy a tax except for its necessary expenses, since that constitutional provision places no limitation upon the General Assembly or on an instrumentality of the State created by the General Assembly for a public purpose.

16. **Taxation § 4— constitutional limitation on increase of public debt — bonds and notes of N. C. Housing Corporation**

Bonds and notes authorized to be issued by the North Carolina Housing Corporation which, by statutory restriction, are payable solely from the revenues or assets of the Corporation will not create a debt within the meaning of the Constitution, and therefore the debt limitations of Article V, § 4 of the North Carolina Constitution are inapplicable thereto.

17. **Taxation § 4— fund available for payment of principal and interest of N. C. Housing Corporation obligations — pledge of faith or credit of State**

The fact that an amount of money heretofore appropriated for use by the North Carolina Housing Corporation and such further appropriations, if any, as the General Assembly may see fit to make, may be used for "the establishment of a reserve or contingency fund to be available for the payment of the principal of and the interest on any bonds or notes of the Corporation" does not constitute a pledge of the faith or credit of the State or of any political subdivision thereof for

Martin v. Housing Corp.

the payment of the principal and interest on any bonds or notes of the Corporation.

18. **Constitutional Law § 7— delegation of legislative powers**

The legislature may not abdicate its power to make laws nor delegate its supreme legislative power to any other coordinate branch or to any agency which it may create, but as to some specific subject matter it may delegate a limited portion of its legislative power to an administrative agency if it prescribes the standards under which the agency is to exercise the delegated powers.

19. **Constitutional Law § 7— N. C. Housing Corporation Act — delegation of legislative authority**

Although the North Carolina Housing Corporation must of necessity determine what persons and what families are to receive its assistance and must exercise its discretion and judgment with reference to the choice of sites and the identity of the sponsor, builder or developer with whom the Corporation will deal in connection with a particular project, the Housing Corporation Act does not delegate legislative authority to the Corporation in violation of Article I, § 8 of the North Carolina Constitution, since the Corporation determines factually, by application of the factors prescribed by the Act, what persons or families are "persons and families of lower income" and therefore entitled to the benefits of the Act, and the Act provides sufficient standards to guide the Corporation in the use of the proceeds from the sale of the Corporation's tax-exempt bonds and in the making of project development loans from the Housing Development Fund.

20. **Taxation § 21— bonds and notes of N. C. Housing Corporation — exemption from taxation — constitutionality**

Since the North Carolina Housing Corporation Act and the Corporation's activities are for a public purpose, provisions of the Act which exempt from taxation the property of the Corporation and bonds and notes issued by the Corporation to effectuate such public purpose do not violate Article V, § 5 of the North Carolina Constitution.

LAKE, J., dissenting.

HIGGINS, J., joins in the dissenting opinion.

APPEAL by defendants from *Bailey, J.,* December 22, 1969 Special Civil Session of WAKE Superior Court, certified, pursuant to G.S. 7A-31, for review by the Supreme Court before determination by the Court of Appeals.

This action is for injunctive relief.

Plaintiff-taxpayer alleges that Chapter 1235, Session Laws of 1969, referred to hereafter as the 1969 Act, which provides for the creation of "a body politic and corporate to be known as the 'North Carolina Housing Corporation,'" and defines its authority, is unconstitutional and therefore void. He prays that

William L. Turner, Director of the Department of Administration, and G. Andrew Jones, Jr., State Budget Officer, and George S. Lambert, State Disbursing Officer, be enjoined "from doing any act or taking any steps constituting the expenditure of any funds from the general fund of the State of North Carolina for or on behalf of the North Carolina Housing Corporation or causing any funds to be expended by said Corporation for or on its behalf," and that the North Carolina Housing Corporation, hereafter referred to as Corporation, be enjoined "from accepting said funds and undertaking to carry out investments and programs in construction and development of residential housing to be financed in any degree with public funds or with tax exempt revenues."

Defendants assert the 1969 Act, which is now codified in the 1969 Cumulative Supplement to Volume 3B of the General Statutes of North Carolina as Chapter 122A, consisting of Sections 122A-1 through 122A-23, is in all respects constitutional and valid.

The pleadings establish these facts:

Plaintiff is a citizen and resident of Northampton County, North Carolina. He pays ad valorem taxes to one or more municipalities and also to one or more counties in northeastern North Carolina. He pays income, sales and intangible taxes to the State of North Carolina; and income and excise taxes to the United States of America.

The Corporation is composed of nine members, consisting of Edwin M. Gill, State Treasurer; William L. Turner, Director of the Department of Administration; Roy G. Sowers, Jr., Director of the Department of Conservation and Development; G. Irvin Aldridge, Director of the Department of Local Affairs; Jacob Koomen, State Health Officer; and the following four citizens and residents of North Carolina appointed by the Governor, to wit, R. Peyton Woodson III; John W. Winters; Roy A. Southerland; and Claude E. Pope. R. Peyton Woodson III, was designated by the Governor to serve as Chairman. (1969 Act, s. 4.)

The individual defendants are officials of the State of North Carolina in the capacities set forth in the caption.

Martin v. Housing Corp.

The Corporation was created as a public agency, an instrumentality of the State of North Carolina, and empowered to act on behalf of the State of North Carolina for the purpose of providing residential housing "for sale or rental to persons and families of lower income." (1969 Act, s. 2.)

Defendants, under color of their respective offices, are about to transfer to the Corporation the $500,000.00 appropriated from the General Fund of the State by Chapter 1162, Session Laws of 1965, for the fiscal years 1969-1970 and 1970-1971, or a portion thereof, to enable the Corporation "to further organize and pay the expenses of its administration during the first two years of the Corporation's operation," and that these and such additional funds as may be appropriated will be used by the Corporation for purposes enumerated in the 1969 Act.

The Corporation is authorized "to provide for the issuance, at one time or from time to time, of not exceeding two hundred million dollars ($200,000,000) bonds of the Corporation to carry out and effectuate its corporate purposes; provided, however, that not more than fifty million dollars ($50,000,000) bonds shall be issued prior to June 30, 1971." (1969 Act, s. 8.)

The Corporation is authorized "to provide for the issuance, at one time or from time to time, of Housing Development Fund notes for the purpose of providing funds for such Fund: provided, however, that not more than five million dollars ($5,000,-000.00) fund notes shall be outstanding at any one time. The principal of and the interest on any such fund notes shall be payable solely from the Housing Development Fund." (1969 Act, s. 7.)

It was stipulated and agreed that the court, without a jury, should hear the evidence, make findings of fact and conclusions of law and enter judgment. Thereupon, the parties submitted a Stipulation of Facts, referred to hereafter as the Stipulation.

Additional facts established by the Stipulation are summarized or quoted below.

In Paragraph 8, the twenty-one specific powers which Section 5 of the 1969 Act purports to confer on the Corporation are quoted verbatim. It was stipulated that the Corporation proposed to exercise each and all of these powers.

In Paragraph 9, it was stipulated that the Corporation proposed to carry out the following program:

"(a) to issue self-liquidating tax exempt housing revenue bonds to be sold as tax exempt securities in the national bond market, with the approval of the Local Government Commission, up to a maximum of two hundred million dollars, and more if needed and if permitted by amendment to the statute;

"(b) to use the money obtained for the purchase of federal insured mortgage and construction loans, for establishing working agreements with private financial institutions such as banks, savings and loans, and mortgage brokers whereby the individual borrower would make application through the private lending institution and the private lending institution would service the mortgage for a fee in behalf of the Corporation. The private institution would receive a service fee in the range of one-half percent, and would forward monthly payments to the Corporation. The Corporation would pay the bondholders on its loans and would from time to time sell mortgages to investors;

"(c) to operate in this manner, the Corporation proposes to market its bonds at an interest rate lower than it receives, and thereby have a sufficient margin to pay for some of its expenses and losses;

"(d) to establish a special revolving fund known as the Housing Development Fund, administered as a separate trust fund funded from gifts, grants and loans from industries, foundations and government with a total capitalization of five million dollars, with the fund maintained on a business level with interest payable, when earned and with some agreement for the repayment of principal for said loans."

In Paragraph 10, it was stipulated that the Housing Development Fund, created and established by Section 7 of the 1969 Act would be used for the following three purposes:

"(a) Providing project development loans (seed money) to builders, sponsors and developers of residential housing for lower income families. These loans would cover such preconstruction activities as site engineering, preliminary architectural drawing, land options and legal fees, and this money would be repaid from construction loans or mortgage proceeds; these costs should not exceed five percent of the final cost of a dwelling unit;

Martin v. Housing Corp.

"(b) providing (through loans) down-payment assistance to needy, but otherwise qualified families seeking to purchase a home. The down-payment assistance would help young wage earners, and others who lack the down-payment, where prudent business practices justify this assistance with a limit in the range of $300.00 per family.

"(c) providing uninsured loans in part with private lenders to builders and developers for land development and residential construction for lower income families. This program would assist small builders who cannot obtain funds at a reasonable interest rate in the market for subdivision development. The private lender would participate in this program to an extent of at least twenty (20%) percent of the total loan, on subdivisions that meet minimum design requirements, where housing would qualify for mortgage insurance programs."

In Paragraph 11, it was stipulated that "(t)he Corporation will use the $500,000.00 appropriation to cover administrative cost during the first two years, and to establish the bond contingency fund"; and that "(d)uring the first two years it will be necessary for the Corporation to establish a pattern and history of operation to assure that its bonds and other obligations meet a favorable reception in the market."

In Paragraph 12, it was stipulated that "(t)he Corporation proposes to help overcome the shortage of adequate housing by making financial assistance available where private funds are not available, in the range of lower income families, and using the existing framework of private financing and construction industries."

Paragraph 13 provides: "The interest rate charged for private loans for residential housing has increased substantially in recent years. A federally guaranteed loan for a single family dwelling was in the range of six (6%) percent in 1965, seven (7%) percent in 1967, and eight (8%) percent in 1969. Conventional loans for single family residential housing are not available for over eighty (80%) percent of the purchase price in most cases, and such loans are in the same general range of interest as those which are federally insured. At the same time, the Local Government Commission of North Carolina has experienced a substantial increase in interest rates for municipal bonds."

Paragraph 14 provides: "On the basis of the Municipal Bond Buyers' Index, which is similar in the field of municipal bonds to the Dow-Jones Average in the field of corporate stocks, the average national interest rate for revenue bonds, which is closely paralleled in the case of North Carolina revenue bonds, was 4.56% in 1965, 5.45% in 1967 and 7.88% in 1969. Because of interest rate ceilings by reason of either legislative restrictions or limitations imposed by certain municipal governing bodies, there are cases in which the North Carolina Local Government Commission has recently been unable to find a ready market for certain North Carolina Local Governmental revenue bonds."

Paragraph 15 provides: "The State of North Carolina has found a better market for its general obligation bonds, with an average interest rate of 3.56% in 1965, 4.45% in 1967 and 6.88% in 1969. It is readily observable that revenue bonds ordinarily command an interest rate which will be 1% per year higher than general obligation governmental bonds. Revenue bonds of the North Carolina Housing Corporation could not be marketed at as favorable an interest rate, from the State's point of view, as general obligation bonds of the State."

In Paragraph 16, it was stipulated that the Corporation had taken the following action:

"(a) That the Corporation held an organizational meeting in October, 1969, in the City of Raleigh, North Carolina, that the members of the Corporation have taken an oath of office, and that they are now acting and the Corporation has a Chairman, Vice Chairman, and acting Secretary.

"(b) That the Corporation has employed the Honorable Joe E. Eagles of Edgecombe County to serve as Executive Director and, in such capacity, he has established an office for the transaction of the business of the Corporation. The Corporation has employed necessary personnel and the Corporation is undertaking to carry out the program authorized by the General Assembly in the creation of the Corporation.

"(c) That in carrying out its function, the Corporation has already expended a very small portion of the $500,000.00 of the General Fund appropriation provided for it by Chapter 1162 of the Session Laws of 1969, to pay salaries of Corporation employees, purchase office equipment and supplies, defray necessary

travel expenses while engaged in the business of the Corporation and to take other preliminary steps in making preparation for issuing bonds pursuant to the provisions of the Act creating the Corporation."

Paragraph 17 refers to attached Exhibit A, a two-page document designated as "Table 9: INADEQUATE HOUSING IN NORTH CAROLINA COUNTIES, 1960," based on 1960 reports of the United States Census, indicating housing units in this State which are either structurally unsound or lacking adequate plumbing facilities. Quoting from Paragraph 17: "Table 9 (Column 3) shows that the percentage of such housing units ranges from a low of 20.6% (Dare) to a high of 72.8% (Northampton). In terms of absolute numbers, Dare has the fewest such units (835), Guilford the most (20,526). Besides Dare, seven other counties rate below 30%: Durham, Forsyth, Guilford, Mecklenburg, New Hanover, Onslow, and Wake. At the other extreme, 33 counties have over 60% of their housing units unsound or lacking in adequate plumbing facilities; some are in the mountain counties, but the largest concentration is in the eastern half of the State."

Paragraph 18 refers to attached Exhibit B, a one-page document which shows annual salary ranges of mortgagors in North Carolina with FHA secured mortgages, which figures were compiled by Harold Albright, Assistant Regional Administrator for FHA. Quoting from Paragraph 18: "These figures indicate, among other things, that 91.5% of the mortgagors with new homes earn an annual salary of $7,000.00 or more. Mortgagors who earn an average annual salary of less than $6,000.00 constitute only 2.6% of such mortgagors with new homes."

Paragraph 19 refers to attached Exhibit C, a seventeen-page pamphlet entitled, "North Carolina Housing Corporation," which has been issued by the Corporation and sets forth a description of the Corporation, its inception, its purposes, its method of operation, and other matters relating to the Act in question.

Paragraph 20 states that the United States Department of Housing and Urban Development has a program intended to enable lower income families to become home owners, and refers to attached Exhibit D, a document entitled, "Home Ownership for Low Income Families, October, 1968," indicating that some housing programs are available to citizens of low income, families

of marginal credit, and for families who need assistance payments and other forms of aid. Quoting from Paragraph 20: "Federal funds are also available through VA and FHA insured loans, Farmers Home Administration loans in rural areas in small communities, and through public housing programs. Federal funds afford citizens of low income an opportunity to rent apartments with rent subsidy, or other plans of aid, and federal funds also permit some projects in which citizens of low income can lease-purchase and eventually own single family houses of good quality as illustrated by Apollo Heights, Raleigh, North Carolina, in which about two hundred (200) homes were occupied during 1969."

In Paragraph 21, it was stipulated: "Housing needs are changing and housing techniques are changing. In 1969, about twenty (20%) percent of the single family units were mobile home types, being marketed in the range of $5,000.00 to $8,000.00, plus finance charges."

In Paragraph 22, it was stipulated: "Private construction has steadily increased year after year, and federal programs have expanded rapidly, but there is still a substantial need in North Carolina for improved housing, either public or private, for thousands of North Carolina families whose annual income is in the lower twenty-five (25%) percent. Many of the houses now being occupied lack suitable accommodations for the health of the occupant."

In Paragraph 23, it was stipulated that attached Exhibit E, a copy of the 1969 Act, was enacted by the General Assembly upon the strong urging of the Governor. Quoting from Paragraph 23: "North Carolina has not previously been active in this field, other than providing enabling legislation and regulations for local communities to establish public housing organizations. A few states have undertaken a similar program, but there is insufficient evidence to evaluate the success of such a program in other areas of the country."

The Stipulation, after setting forth these factual matters, states and presents for determination the following six questions of law, viz.:

I. "Does the Act authorize the use of public funds for other than a public purpose in violation of Section 3 of Article V or Section 17 of Article I of the North Carolina Constitution or

Martin v. Housing Corp.

Section 1 of the Fourteenth Amendment to the United States Constitution?"

II. "Does the Act authorize the lending of the credit of the State in violation of Section 6 of Article VII or Section 4 of Article V of the North Carolina Constitution?"

III. "Does the Act provide for a delegation of legislative authority in violation of Section 8 of Article I of the North Carolina Constitution?"

IV. "Does the Act authorize the creation of a debt in violation of Section 6 of Article VII or Section 4 of Article V of the North Carolina Constitution?"

V. "Does the Act exempt property from taxation in violation of Section 5 of Article V of the North Carolina Constitution?"

VI. "Does the Act violate basic due process, and basic public purpose, in the broad constitutional sense, by permitting an agency of the State of North Carolina to engage in a function that is reserved to private enterprise under our system of government, and does said Act constitute a complete departure from the constitutional provisions for the government and taxation within the State of North Carolina?"

The court, after adopting as its Findings of Fact the facts set forth in the Stipulation, concluded as a matter of law that the 1969 Act is unconstitutional on each and all of the grounds on which it is challenged by plaintiff, and entered judgment as follows:

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED:

"1. That the North Carolina Housing Corporation is hereby restrained from issuing tax exempt revenue bonds, and it is hereby adjudged that Chapter 1235, Session Laws of 1969, is an unconstitutional Act of the General Assembly.

"2. That said Corporation may not lawfully receive any of the unexpended funds of the sum of $500,000.00 of public funds appropriated for fiscal year 1969-1971 by the General Assembly of North Carolina.

"3. That the individual defendants as officials of the State of North Carolina, and their successors in office, are hereby restrained from transmitting any of the unexpended funds of said $500,000.00 appropriation of public funds to said corporate defendant, North Carolina Housing Corporation.

"4. That the relief sought by the plaintiff be and it is in all respects allowed, and all of said defendants shall forever cease from said unlawful and unconstitutional action, as heretofore set forth in this judgment.

"5. That the cost of this action be taxed against the plaintiff."

Defendants excepted to each of the court's legal conclusions, and to the judgment, and appealed.

*Johnson & Gamble for plaintiff appellee.*

*Attorney General Morgan, Deputy Attorney General McGalliard and Staff Attorney Blackburn for defendant appellants.*

BOBBITT, C. J.

[1-3] "(U)nder our Constitution, the General Assembly, so far as that instrument is concerned, is possessed of full legislative powers unless restrained by express constitutional provision or necessary implication therefrom." Hoke, J. (later C. J.), in *Thomas v. Sanderlin,* 173 N.C. 329, 332, 91 S.E. 1028, 1029. Absent such constitutional restraint, questions as to public policy are for legislative determination. *Reid v. R. R.,* 162 N.C. 355, 358, 78 S.E. 306, 307. When the constitutionality of a statute is challenged, "every presumption is to be indulged in favor of its validity." Stacy, C. J., in *State v. Lueders,* 214 N.C. 558, 561, 200 S.E. 22, 24. And, ordinarily, this Court will not undertake to determine whether a statute is unconstitutional except with reference to a ground on which it is attacked and definitely drawn into focus by the attacker's pleadings. *Hudson v. R. R.,* 242 N.C. 650, 667, 89 S.E. 2d 441, 453; *Surplus Store, Inc. v. Hunter,* 257 N.C. 206, 211, 125 S.E. 2d 764, 768.

[4] Whether the public policy and program established by the 1969 Act is wise or unwise is for determination by the General Assembly. *Education Assistance Authority v. Bank,* 276 N.C. 576, 592, 174 S.E. 2d 551, 563. Our function is to determine whether any portion thereof which plaintiff, as a general tax-

payer, may challenge, is unconstitutional on any ground asserted by him. *Nicholson v. Education Assistance Authority,* 275 N.C. 439, 168 S.E. 2d 401.

Section 18 of the 1969 Act authorized the Corporation "to accept such moneys as may be appropriated from time to time by the General Assembly for effectuating its corporate purposes including, without limitation, the payment of the initial expenses of administration and operation and the establishment of a reserve or contingency fund to be available for the payment of the principal of and the interest on any bonds or notes of the Corporation." The General Assembly appropriated "out of the General Fund of the State" to the Corporation "the sum of five hundred thousand dollars ($500,000.00) for the biennium commencing July 1, 1969." Chapter 1162, Session Laws of 1969. Portions of this appropriation have been used and are being used for the payment of the initial expenses of administration and operation of the Corporation.

## QUESTIONS I and VI

Questions I and VI present essentially the same question, namely, whether the 1969 Act and the Corporation's activities pursuant thereto are for a PUBLIC PURPOSE.

[5]    Article V, § 3, of the Constitution of North Carolina provides: "This power of taxation shall be exercised in a just and equitable manner, *for public purposes only,* and shall never be surrendered, suspended, or contracted away." (Our italics.) "The power to appropriate money *from* the public treasury is no greater than the power to levy the tax which put the money in the treasury." *Mitchell v. Financing Authority,* 273 N.C. 137, 143, 159 S.E. 2d 745, 749-750.

[6, 14]    Plaintiff asserts the 1969 Act is unconstitutional as violative of Article V, § 3, of the Constitution of North Carolina, and of Article I, § 17, of the Constitution of North Carolina, and of Section 1 of the Fourteenth Amendment to the Constitution of the United States, and is void because the purpose for which the Corporation was created is not a public purpose. If so, plaintiff, as taxpayer, may maintain this action to restrain defendants from paying to the Corporation and the Corporation from using the $500,000.00 appropriated out of the General Fund for the biennium commencing July 1, 1969. *Mitchell v. Financing Au-*

*thority, supra; McIntyre v. Clarkson,* 254 N.C. 510, 513, 119 S.E. 2d 888, 890; *Dennis v. Raleigh,* 253 N.C. 400, 116 S.E. 2d 923.

[7]   Was the Corporation established for a public purpose? If so, "the means of executing the project are for the General Assembly, and the General Assembly alone, to determine." *Redevolpment Commission v. Bank,* 252 N.C. 595, 606, 114 S.E. 2d 688, 696.

[8, 9]   "A slide-rule definition to determine public purpose for all time cannot be formulated; the concept expands with the population, economy, scientific knowledge, and changing conditions. As people are brought closer together in congested areas, the public welfare requires governmental operation of facilities which were once considered exclusively private enterprises, *Fawcett v. Mt. Airy,* 134 N.C. 125, 45 S.E. 1092, and necessitates the expenditure of tax funds for purposes which, in an earlier day, were not classified as public. *Keeter v. Lake Lure,* 264 N.C. 252, 141 S.E. 2d 634. Often public and private interests are so co-mingled that it is difficult to determine which predominates. It is clear, however, that for a use to be public its benefits must be in common and not for particular persons, interests, or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that of an individual or private entity. *Briggs v. Raleigh,* 195 N.C. 223, 141 S.E. 597." Sharp, J., in *Mitchell v. Financing Authority, supra,* at 144, 159 S.E. 2d at 750.

[10, 11]   A legislative declaration which asserts in general terms that the statute under consideration is enacted for a public purpose, although entitled to great weight, is not conclusive. When the facts are determined, what is a public purpose is a question of law for the court. *Redevelopment Commission v. Bank, supra,* at 603, 114 S.E. 2d 694.

In its enactment of the 1969 Act, the General Assembly went far beyond a mere declaration as to public purpose. It made and set forth in Section 2 thereof its factual findings as to the conditions upon which it based its declaration as to public purpose, *viz.:*

1.   "(A)s a result of the spread of slum conditions and blight to formerly sound urban and rural neighborhoods and as a result of actions involving highways, public facilities and urban

renewal activities there exists in the State of North Carolina a serious shortage of decent, safe and sanitary residential housing available at low prices or rentals to persons and families of lower income. This shortage is severe in certain urban areas of the State, is especially critical in the rural areas, and is inimical to the health, safety, welfare and prosperity of all residents of the State and to the sound growth of North Carolina communities."

2. "(P)rivate enterprise and investment have not been able to produce, without assistance, the needed construction of decent, safe and sanitary residential housing at low prices or rentals which persons and families of lower income can afford, or to achieve the urgently needed rehabilitation of much of the present lower income housing. It is imperative that the supply of residential housing for persons and families of lower income affected by the spread of slum conditions and blight and for persons and families of lower income displaced by public actions or natural disaster be increased; and that private enterprise and investment be encouraged to sponsor, build and rehabilitate residential housing for such persons and families, to help prevent the recurrence of slum conditions and blight and assist in their permanent elimination throughout North Carolina."

3. "(I)n accomplishing this purpose, the North Carolina Housing Corporation, a public agency and an instrumentality of the State, is acting in all respects for the benefit of the people of the State in the performance of essential public functions and serves a public purpose in improving and otherwise promoting their health, welfare and prosperity, and that the North Carolina Housing Corporation is empowered to act on behalf of the State of North Carolina and its people in serving this public purpose for the benefit of the general public."

[12] "If the constitutionality of a statute . . . depends on the existence or nonexistence of certain facts and circumstances, the existence of such facts and circumstances will generally be presumed for the purpose of giving validity to the statute, . . . if such a state of facts can reasonably be presumed to exist, and if any such facts may be reasonably conceived in the mind of the court. This rule does not apply if the evidence is to the contrary, or if facts judicially known or proved, compel otherwise." 16 C.J.S. Constitutional Law § 100b, pp. 454-455. Accord: 16 Am. Jur. 2d Constitutional Law § 143.

In *Velishka v. Nashua,* 106 A.2d 571, 44 A.L.R. 2d 1406, the Supreme Court of New Hampshire sustained the constitutionality of the Urban Development Law of that State. After stating the legislative findings and declarations of necessity relating to the elimination of blighted areas and the advancement of redevelopment projects, Chief Justice Kenison states: "These legislative findings and declarations have no magical quality to make valid that which is invalid but they are entitled to weight in construing the statute and in determining whether the statute promotes a public purpose under the Constitution." Accord: *Redevelopment Commission v. Bank, supra,* at 611, 114 S.E. 2d at 700.

In *State ex rel. W. Va. Housing Dev. Fund v. Copenhaver,* 171 S.E. 2d 545 (1969), the Supreme Court of Appeals of West Virginia sustained the constitutionality of the legislation which created The West Virginia Housing Development Fund. The West Virginia Act is similar to our 1969 Act and similar constitutional questions were presented and decided. Legislative findings set forth in Section 6 of the West Virginia Act are in accord, verbatim or in substance, with the legislative findings quoted from Section 2 of our 1969 Act. With reference thereto, Calhoun, J., for the Court, said: 'Legislative findings of fact which are made the basis of a legislative act are not thereafter open to judicial investigation." In the present case, whether the legislative findings of fact are conclusive need not be determined. Suffice to say, the facts set forth in the Stipulation confirm the legislative findings. There are no facts of which we may take judicial notice which tend to negate the legislative findings. On the contrary, current widespread publicity indicates an acute shortage of residential housing for persons and families of lower income.

[13] The General Assembly, exercising the police power of the State, may legislate for the protection of the public health, safety, morals and general welfare of the people. Accordingly, this Court upheld the constitutionality of the Housing Authorities Law, Chapter 456, Public Laws of 1935, which, as amended, is codified as Article 1, Chapter 157, of the General Statutes, G.S. 157-1 through G.S. 157-39.8. *Wells v. Housing Authority,* 213 N.C. 744, 197 S.E. 693 (1938). It was held that a Housing Authority organized pursuant to the provisions of this 1935 Act was created for a public purpose and exercised an essential governmental function. Briefly stated, its public purpose was

the elimination or rehabilitation of unsafe and unsanitary dwelling units in crowded and congested areas and the construction of housing projects to provide safe and sanitary dwelling units for rental to persons of low income. In *Wells v. Housing Authority, supra,* Seawell, J., for the Court, said: "The State cannot enact laws, and cities and towns cannot pass effective ordinances, forbidding disease, vice, and crime to enter into the slums of overcrowded areas, there defeating every purpose for which civilized government exists, and spreading influences detrimental to law and order; but experience has shown that this result can be more effectively brought about by the removal of physical surroundings conducive to these conditions. This is the objective of the act, and these are the means by which it is intended to accomplish it." Our decision in *Wells v. Housing Authority* was approved and followed in *Cox v. Kinston,* 217 N.C. 391, 8 S.E. 2d 252 (1940), and in *Mallard v. Housing Authority,* 221 N.C. 334, 20 S.E. 2d 281 (1942).

The 1935 Act conferred the power of eminent domain upon a Housing Authority created in accordance with its provisions and prescribed the procedural requirements incident to the exercise thereof. G.S. 157-11; G.S. 157-28. Later decisions based on the 1935 Act relate to such procedural requirements and to the selection of sites for housing projects. In *In re Housing Authority,* 233 N.C. 649, 65 S.E. 2d 761 (1951), and in *Housing Authority v. Wooten,* 257 N.C. 358, 126 S.E. 2d 101 (1962), it was held, *inter alia,* that a Housing Authority had wide discretion in the selection and location of a site for a housing project; that it was not required to select a site in a slum area as the site for a low-rent housing project; and that the fact that a few isolated properties in an area to be taken and dismantled were above the average standard of slum properties, or that some few desirable homes would be taken, did not affect the public character of the condemnation proceeding.

It is noted that statutory provisions relating to a Housing Authority created in accordance with the 1935 Act include the following: "The bonds and other obligations of an Authority (and such bonds and obligations shall so state on their face) shall not be a debt of any city or municipality and neither the State nor any such city or municipality shall be liable thereon, nor in any event shall such bonds or obligations be payable out of any funds or property other than those of said authority." G.S. 157-14. G.S. 157-26 provides that the property of such

Housing Authority shall be exempt from State and local taxes and fees; and that the "(b)onds, notes, debentures and other evidences of indebtedness" of such Housing Authority "shall be exempt from taxes."

In *Housing Authority v. Dockweiler,* 94 P. 2d 794 (1939), the Supreme Court of California considered California legislation which contained provisions substantially the same as those of our Housing Authorities Law. The opinion of Shenk, J., cites a decision from each of fifteen States, including our decision in *Wells v. Housing Authority, supra,* in which the constitutionality of similar statutes had been "fully sustained as against onslaughts similar in character to those here urged." Later cases in accord are cited in *Humphrey v. City of Phoenix,* 102 P. 2d 82, 86 (Ariz. 1940).

*Housing Authority v. Dockweiler, supra* at 803, decides a question which was not expressly raised and considered in *Wells v. Housing Authority, supra,* namely, that "(t)he tax exemption available to the property of housing authorities" included "bonds issued by them and the income therefrom." Decisions in accord from other jurisdictions are cited by Shenk, J.

In *Redevelopment Commission v. Bank, supra,* this Court upheld the constitutionality of the Urban Redevelopment Act, Chapter 1095, Session Laws of 1951, which, as amended, is now codified as Article 37, Chapter 160, of the General Statutes, G.S. 160-454 through G.S. 160-474.1. It was held that the condemnation of blighted and slum areas within a municipality and the sale or exchange thereof "to any redeveloper for residential, recreational, commercial, industrial or other uses or for public use in accordance with the redevelopment plan" (G.S. 160-464) under safeguards to prevent such areas from reverting to slum areas, was in the interest of the public health, safety, morals and welfare, and therefore such condemnation was for a public purpose. The opinion of Parker, J. (later C. J.), states: "It may be that the measure may prove eventually to be a disappointment, and is ill advised, but the wisdom of the enactment is a legislative and not a judicial question. The General Assembly has the right to experiment with new modes of dealing with old evils, except as prevented by the Constitution." *Id.* at 612, 114 S.E. 2d at 700. Later cases which hold that lands acquired for the purposes and in the manner set

forth in the Urban Redevelopment Law meet the public purpose test include the following: *Redevelopment Commission v. Hagins,* 258 N.C. 220, 128 S.E. 2d 391 (1962); *Horton v. Redevelopment Commission,* 259 N.C. 605, 131 S.E. 2d 464 (1963). The constitutional questions raised in connection with statutes such as our Urban Redevelopment Law are discussed fully and clearly by Schaefer, J., in *People v. City of Chicago,* 111 N.E. 2d 626 (Ill. 1953), and cases cited therein.

The dwelling accommodations provided by a project of a Housing Authority created pursuant to G.S. Chapter 157 are available at the lowest possible rentals to persons of meager income. G.S. 157-29 provides: "It (Housing Authority) shall not accept any person as a tenant in any housing project if the person or persons who would occupy the dwelling accommodations have an annual net income in excess of five times the annual rental of the quarters to be furnished such person or persons, except that in the case of families with three or more minor dependents, such ratio shall not exceed six to one . . . ." When the annual net income of the tenant(s) exceeds the prescribed limit, he (they) must move to other dwelling accommodations.

The evident function of the Corporation created by the 1969 Act is to assist "persons and families of lower income" who desire and seek residential housing elsewhere than as tenants in a low-cost housing project. Such persons would include those who were or are ineligible to be tenants in a housing project. The Corporation is not vested with the power of eminent domain. Unlike a Housing Authority, it does not seek to acquire real property for the purpose of providing low-rental dwelling accommodations. Rather, its function is to foster the planning, construction and financing of modest residences which would not otherwise be available to "persons and families of lower income."

The 1969 Act confers upon the Corporation all the powers necessary or convenient to carry out and effectuate its purposes and provisions, including the twenty-one specific powers set forth in Section 5 thereof. In the present context, it is sufficient to quote the first four of these powers, *viz.:*

"(1) To make or participate in the making of insured construction loans to sponsors of land development or residential housing; provided, however, *that such loans shall be made only*

*upon the determination by the Corporation that construction loans are not otherwise available, wholly or in part, from private lenders upon reasonably equivalent terms and conditions;*

"(2)   To make or participate in the making of insured mortgage loans to sponsors of residential housing; *provided, however, that such loans shall be made only upon the determination by the Corporation that mortgage loans are not otherwise available, wholly or in part, from private lenders upon reasonably equivalent terms and conditions;*

"(3)   To purchase or participate in the purchase of insured mortgage loans made to sponsors of residential housing or to persons of lower income for residential housing where the Corporation has given approval prior to the initial making of such loan; *provided, however, that any such purchase shall be made only upon the determination by the Corporation that mortgage loans were, at the time such approval was given, not otherwise available, wholly or in part, from private lenders upon reasonably equivalent terms and conditions;*

"(4)   To make temporary loans from the housing development fund. . . ." (Our italics.)

The legislative findings and the Stipulation establish the existence of a serious shortage of decent, safe and sanitary housing available at low prices or rentals to persons and families of lower income and also the inability of private enterprise and investment, without assistance, to meet that need.

Unquestionably, when construction of residential housing is made possible by the Corporation's assistance, all persons in the building industry benefit from such construction.   Such benefit is similar to that which results from the construction of any public project, *e.g.,* public buildings, school buildings, highways, etc. Too, the "persons and families of lower income" who will occupy such residential housing as owners or tenants will benefit from the existence and availability thereof. Although these benefits will flow from the Corporation's authorized activities, its *raison d'etre,* the reason and justification for its existence, is to make available decent, safe and sanitary housing to "persons and families of lower income" who cannot otherwise obtain such housing accommodations. The General Assembly, with good reason, was fully aware that the acquisition of homes by "persons and families of lower income" gives them a stake

in the preservation of our society. Nothing could contribute more to the stability of our institutions than the acquisition of homes by an ever-increasing proportion of our people.

Plaintiff relies upon *Mitchell v. Financing Authority, supra,* in which this Court held unconstitutional the North Carolina Industrial Development Financing Act, Chapter 535, Session Laws of 1967, codified as Chapter 123A of Volume 3B (1969 Cumulative Supplement) of the General Statutes, G.S. 123A-1 through 123A-27. In distinguishing the Industrial Development Financing Act from the Housing Authorities Act, Sharp, J., said: "The State does not engage in a private enterprise when it undertakes a project of slum clearance. *Wells v. Housing Authority,* 213 N.C. 744, 197 S.E. 693 (1938). Slums are a serious menace to society; they breed both disease and crime. As Seawell, J., pointed out in *Wells v. Housing Authority, supra,* the State can combat these two evils in overcrowded areas only by 'the removal of physical surroundings conducive to these conditions.' *Id.* at 748, 197 S.E. at 696. *The existence of a slum area proves the impotency or unwillingness of private enterprise to cope with the problem and 'where community initiative has failed and authority alone can prevail,' government must deal with the emergency created. Id.* at 748, 197 S.E. at 696." (Our italics.) *Mitchell v. Financing Authority, supra* at 157-158, 159 S.E. 2d at 759.

In these and other respects, the Industrial Development Financing Act is distinguishable from the 1969 Act now under consideration. There the State was undertaking to subsidize particular private industries which were in competition with other unsubsidized private industries. As pointed out by Sharp, J., in *Mitchell v. Financing Authority, supra* at 159, 159 S.E. 2d at 760, the Authority's primary function was "to acquire sites and to construct and equip facilities for private industries" and "to bait corporations which refuse to become industrial citizens of North Carolina unless the State gives them a subsidy."

[14] The Corporation's authorized activities respond to a serious need of deep public concern but do so *only* when the planning, construction and financing of residential housing is not otherwise available to "persons and families of lower income." We are of opinion and hold that the 1969 Act was enacted for a PUBLIC PURPOSE and that the Corporation's authorized activities pursuant thereto are for a PUBLIC PURPOSE.

The only decisions in other jurisdictions involving legislation similar to our 1969 Act which have come to our attention are the following:

(1)  *State ex rel. W. V. Housing Dev. Fund v. Copenhaver, supra,* decided December 9, 1969, involved the West Virginia Housing Development Act, which consists of statutes enacted in 1968 and 1969 and is now codified in Volume 10 of the West Virginia Code, 1970 Cumulative Supplement, as Chapter 31, Article 18. This West Virginia statute contains substantially (often verbatim) the same provisions as our 1969 Act. Its constitutionality was fully sustained. In all respects, this West Virginia decision is in accord with our decision in the present case.

(2)  *In re Advisory Opinion,* 158 N.W. 2d 416 (Mich. 1968), in which the Supreme Court of Michigan rendered an advisory opinion relating to the constitutionality of the Michigan statutes (Volume 8 of Michigan Compiled Laws, Sections 125.1401 *et seq.,* including 1969 Cumulative Pocket Part) which created the Michigan State Housing Development Authority. The Michigan legislation was approved in all respects except the following: The Michigan statutes provided for a Housing Development Fund similar to the Housing Development Fund created by our 1969 Act. The Michigan statutes also provided for a Capital Reserve Fund for use in discharging the obligations of the Development Authority. In the context of specific provisions of the Constitution of Michigan, the opinion expressed was that, although an *appropriation* to the Development Authority for the purpose of administration was for a proper public purpose, an appropriation to the Housing Development Fund or to the Capital Reserve Fund of the Development Authority was not for a proper public purpose. The only decision cited in support of this conclusion is *Opinion of the Justices to the House of Representatives,* 195 N.E. 897 (Mass. 1935), 98 A.L.R. 1364. The 1969 Massachusetts decision referred to below was decided subsequent to the advisory opinion in the Michigan case.

In the Michigan case, the Court, after expressing the opinion that *an appropriation* for the Housing Development Fund or for the Capital Reserve Fund was not for a proper public purpose, stated: "This does not mean, however, that the State can, under no circumstances, appropriate public money to such funds. Constitution 1963, art. 4, § 30, provides: 'The

assent of two-thirds of the members elected to and serving in each house of the legislature shall be required for the appropriation of public money or property for local or private purposes.' "

(3) *Massachusetts Hous. F. Ag. v. New England Mer. Nat. B.,* 249 N.E. 2d 599 (Mass. 1969), in which the Supreme Judicial Court of Massachusetts considered questions relating to the constitutionality of the Massachusetts statutes which created the Massachusetts Housing Finance Agency. Volume 2A of Massachusetts General Laws Annotated, Appendix to Chapter 23A, 1970 Cumulative Pocket Part. This decision revises substantially the views expressed in *Opinion of the Justices,* 219 N.E. 2d 18 (Mass. 1966), an advisory opinion. Generally, the 1969 Massachusetts decision is in accord with our decision in the present case.

(4) *Vermont Home Mtg. Cr. Ag. v. Montpelier Nat. Bank,* 262 A. 2d 445 (Vt. 1970), in which the Supreme Court of Vermont upheld as against attack on constitutional grounds the statute creating the Vermont Home Mortgage Credit Agency. Volume 3 of Vermont Statutes Annotated, Title 10, Chapter 11B, §§ 241-253a, 1969 Cumulative Pocket Supplement. Although this Vermont decision is in accord with our decision in the present case in several particulars, there are material differences between the Vermont statute there considered and our 1969 Act.

(5) *New Jersey Mortgage Finance Agency and James C. Brady, Jr., Commissioner of Banking, v. Joseph M. McCrane, Jr., Treasurer of the State of New Jersey,* decided July 6, 1970, in which the Supreme Court of New Jersey upheld as against attack on constitutional grounds the New Jersey Mortgage Finance Agency Law. *L.* 1970, *c.* 38, N.J.S.A. 17: 1B-4 *et seq.* New Jersey Session Law Service, 1970 Regular Session, pp. 84-95. Although there are differences between the provisions of the New Jersey Law and our 1969 Act, the main thrust of the New Jersey decision is in accord with our decision in the present case.

## QUESTIONS II AND IV

Questions II and IV present essentially the same question, namely, whether the 1969 Act violated Article VII, § 6, or Article V, § 4, of the Constitution of North Carolina. Question

II refers to "the lending of the credit of the State" and Question IV refers to "the creation of a debt."

[15] Article VII, § 6, provides: "No county, city, town, or other municipal corporation shall contract any debt, pledge its faith or loan its credit, nor shall any tax be levied or collected by any officers of the same except for the necessary expenses thereof, unless approved by a majority of those who shall vote thereon in any election held for such purpose." This constitutional provision is applicable to a "county, city, town, or other municipality." It requires the approval of a majority of the voters therein before such subdivision of the State may pledge its credit or levy a tax except for *its* necessary expenses. It places no limitation upon the General Assembly or on an instrumentality of the State created by the General Assembly for a public purpose.

Article V, § 4, in part, provides: "The General Assembly shall have the power *to contract debts* and *to pledge the faith and credit of the State* and to authorize counties and municipalities to contract debts and pledge their faith and credit for the following purposes: . . . ." (Our italics.)

The 1969 Act provides:

"Sec. 6. *Credit of State not pledged.* Obligations issued under the provisions of this Act shall not be deemed to constitute a debt, liability or obligation of the State or of any political subdivision thereof or a pledge of the faith and credit of the State or of any such political subdivision, but shall be payable solely from the revenues or assets of the Corporation. Each obligation issued under this Act shall contain on the face thereof a statement to the effect that the Corporation shall not be obligated to pay the same nor the interest thereon except from the revenues or assets pledged therefor and that neither the faith and credit nor the taxing power of the State or of any political subdivision thereof is pledged to the payment of the principal of or the interest on such obligation.

"Expenses incurred by the Corporation in carrying out the provisions of this Act may be made payable from funds provided pursuant to this Act and no liability shall be incurred by the Corporation hereunder beyond the extent to which moneys shall have been so provided."

[16]    Decisions of this Court establish that this method of financing does not create a debt within the meaning of the Constitution and therefore the limitations of Article V, § 4, are inapplicable. *Turnpike Authority v. Pine Island,* 265 N.C. 109, 117, 143 S.E. 2d 319, 325 (1965), and cases there cited.

We hold that the 1969 Act does not violate either Article VII, § 6, or Article V, § 4, of the Constitution of North Carolina.

[17]    Section 18 of the 1969 Act provides: "The Corporation is authorized to accept such moneys as may be appropriated from time to time by the General Assembly for effectuating its corporate purposes including, without limitation, the payment of the initial expenses of administration and operation and the establishment of a reserve or contingency fund to be available for the payment of the principal of and the interest on any bonds or notes of the Corporation." However, the fact that the $500,000.00 heretofore appropriated and such further appropriations, if any, as the General Assembly may see fit to make, may be used for "the establishment of a reserve or contingency fund to be available for the payment of the principal of and the interest on any bonds or notes of the Corporation," does not constitute a pledge of the faith and credit of the State or of any political subdivision thereof "for the payment of the principal of and the interest on any bonds or notes of the Corporation." The Corporation has no authority to incur any debt which would obligate the General Assembly to make appropriations. Moreover, the 1969 General Assembly, assuming it had authority to do so, did not purport to control actions of succeeding sessions of the General Assembly. *Massachusetts Hous. F. Ag. v. New England Mer. Nat. B., supra* at 608.

## QUESTION III

[19]    Question III presents the question whether the 1969 Act delegates legislative authority in violation of Article I, § 8, of the Constitution of North Carolina, which provides: "The legislative, executive, and supreme judicial powers of the government ought to be forever separate and distinct from each other."

[18]    "It is settled and fundamental in our law that the legislature may not abdicate its power to make laws nor delegate its *supreme* legislative power to any other coordinate branch or to

any agency which it may create. *Coastal Highway v. Turnpike Authority,* 237 N.C. 52, 74 S.E. 2d 310. It is equally well settled that, as to some *specific* subject matter, it may delegate a *limited* portion of its legislative power to an administrative agency *if* it prescribes the standards under which the agency is to exercise the delegated powers." *Turnpike Authority v. Pine Island, supra* at 114, 143 S.E. 2d at 323, and cases cited.

The clear and declared purpose of the General Assembly is to provide "residential housing" for "persons and families of lower income." Necessarily the Corporation must determine what persons and what families are to receive its assistance.

The General Assembly, in Section 3(11) of the 1969 Act, provided: " '(P)ersons and families of lower income' means persons and families deemed by the Corporation to require such assistance as is made available by this Act on account of insufficient personal or family income, taking into consideration without limitation, such factors as (a) the amount of the total income of such persons and families available for housing needs, (b) the size of the family, (c) the cost and condition of housing facilities available, (d) the eligibility of such persons and families for federal housing assistance of any type predicated upon a lower income basis, and (e) the ability of such persons and families to compete successfully in the normal housing market and to pay the amounts at which private enterprise is providing decent, safe and sanitary housing, and deemed by the Corporation therefore to be eligible to occupy residential housing constructed and financed, wholly or in part, with insured construction loans or insured mortgages, or with other public or private assistance."

[19]   We are of the opinion and hold that the Corporation does not legislate but determines factually, by application of the factors the General Assembly has prescribed, what persons or families are "persons and families of lower income" and therefore entitled to the benefits of the 1969 Act.

A loan which the Corporation is authorized to make or participate in making or to purchase or participate in purchasing is an "insured construction loan" or an "insured mortgage loan," which, as provided in Section 3(7) and (8) of the 1969 Act, means a loan secured by a federally insured mortgage or insured or guaranteed by the United States or an instrumentality thereof or for which there is a commitment by the United States or an instrumentality thereof to insure such loan or mortgage. This

provides sufficient standards for the use of the proceeds from the sale of the Corporation's tax-exempt bonds.

Standards for making the temporary loans from the Housing Development Fund are set forth in Section 7 of the 1969 Act. The purposes for which such loans may be made are specifically defined by the General Assembly.

The public purpose of the 1969 Act is to make *additional* residential housing available to persons and families of lower income by promoting the construction thereof. The function of the Housing Development Fund, "a trust fund separate and distinct from any other moneys or funds administered by the Corporation," is *to initiate* the Corporation's program. Temporary loans from the Housing Development Fund for "development costs" are the first step in an integrated program, the second step being a construction loan, and the third step being permanent financing. Obviously, the Corporation must exercise its discretion and judgment with reference to the choice of sites and the identity of the sponsor, builder or developer with whom the Corporation will deal in connection with a particular project. It is contemplated that such sponsor, builder or developer will continue until completion of the program. No doubt the General Assembly considered this preferable to efforts by the Corporation through its own personnel to undertake the work preparatory to the letting of contracts for the construction of residential housing.

The General Assembly has made no appropriation to the Housing Development Fund. The Housing Development Fund is to be constituted by grants from the federal government or other sources and by money borrowed in connection with the issuance and sale of its fund notes. Although we do not base decision on that ground, plaintiff, as taxpayer, has nothing to lose even if unwise or uncollectible temporary loans are made from the Housing Development Fund.

Plaintiff calls attention to provisions of the 1969 Act to the effect the Corporation may act without the prior approval of any other State agency and that no provision is made for an appeal from any of the Corporation's decisions. Suffice to say, should the factual considerations underlying the 1969 Act cease to exist or should the Corporation undertake any actions in excess of the authority conferred by the 1969 Act, a remedy

through judicial proceedings would be available. Too, presumably the General Assembly will continuously review and evaluate the specific programs of the Corporation; and, if the authorized activities of the Corporation should become unnecessary or prove ineffectual, will amend or repeal the 1969 Act to such extent as may be appropriate.

## QUESTION V

[20]  Question V presents the question whether the 1969 Act exempts property from taxation in violation of Article V, § 5, of the Constitution of North Carolina, which provides that "(p)roperty belonging to the State, counties and municipal corporations shall be exempt from taxation" and enumerates other properties the General Assembly may exempt from taxation. The enumerated properties do not include bonds issued by the State or any State agency, whether revenue bonds or full faith and credit bonds.

Section 19 of the 1969 Act provides:

"*Tax exemption.* The exercise of the powers granted by this Act will be in all respects for the benefit of the people of the State, for their well being and prosperity and for the improvement of their social and economic conditions, and the Corporation shall not be required to pay any tax or assessment on any property owned by the Corporation under the provisions of this Act or upon the income therefrom.

"Any obligations issued by the Corporation under the provisions of this Act, their transfer and the income therefrom (including any profit made on the sale thereof), shall at all times be free from taxation by the State or any local unit or political subdivision or other instrumentality of the State, excepting inheritance or gift taxes."

[20]  In *Education Assistance Authority v. Bank, supra* at 589, 174 S.E. 2d at 560, it was stated: "Since the tax-exempt feature makes possible the more favorable sale of revenue bonds and thereby contributes substantially to the accomplishment of the public purpose for which they are issued, we hold that the General Assembly *may* exempt them from taxation by the State or any of its subdivisions." In accord, we hold that, since the 1969 Act and the Corporation's activities pursuant thereto are

for a public purpose, it was permissible for the General Assembly to exempt from taxation the property of the Corporation and the obligations incurred by the Corporation to effectuate such public purpose. *Cf. Housing Authority v. Dockweiler, supra* at 803, and cases there cited.

On this appeal, we accept the legislative findings, which are supported by facts set forth in the Stipulation, that there exists in North Carolina "a serious shortage of decent, safe and sanitary residential housing available at low prices or rentals to persons and families of lower income" and "that private enterprise and investment have not been able to produce, without assistance," the needed residential housing.

The General Assembly has determined that the State of North Carolina should respond to this serious public need, without encroachment on private enterprise, by the bold and comparatively new course embodied in the 1969 Act. This course recognizes the responsibility and desire of this State, through a Corporation whose members are five highly-placed and responsible State officials and four non-officials appointed by the Governor of the State, to respond to this public need. True, the 1969 Act contemplates federal assistance under certain of the various provisions for federal mortgage insurance (12 U.S.C.A. §§ 1707-1715(z)) and perchance the purchase by some federal corporation or agency of the Corporation's tax-exempt bonds. However, the Corporation, as an instrumentality of the State, will manage the program and make the essential administrative decisions. If the serious shortage of residential housing is to be met, and the State fails to recognize any responsibility in the matter, the only alternative will be ever-increasing programs in which the federal government will deal directly with those in our local communities who desire to sponsor residential housing for persons and families of lower income. Presumably, the General Assembly considered that North Carolina should meet her own problems as far as possible through her own agencies and not turn them over to the exclusive attention of the federal government.

In this action, plaintiff attacks the 1969 Act *in its entirety* on specific constitutional grounds. We hold the 1969 Act is not unconstitutional on its face or when considered with reference to the facts set forth in the Stipulation on any of the grounds asserted by plaintiff. Whether any specific regulation

or activity of the Corporation is authorized by the 1969 Act or, if authorized, whether the 1969 Act is unconstitutional as applied to that precise factual situation, is not before us.

For the reasons stated, the injunction is vacated; the judgment is reversed; and plaintiff's action is dismissed.

Reversed.

LAKE, J., dissenting:

It is my view that the judgment of the superior court should be affirmed because the act under which the Housing Corporation purposes to operate is unconstitutional in that: (1) It appropriates tax revenues for a purpose other than a "public purpose," as that term is used in Article V, § 3, of the Constitution of North Carolina; and (2) it purports to exempt from taxation the bonds which the Housing Corporation proposes to issue, this being a violation of Article V, §§ 3 and 5 of the Constitution of the State.

Article V, § 3, of the Constitution provides: "The power of taxation shall be exercised * * * for public purposes only, and shall never be surrendered, suspended, or contracted away. * * *"

Article V, § 5, provides: "Property belonging to the State, counties and municipal corporations shall be exempt from taxation" and the General Assembly may exempt properties held for specified purposes not here applicable.

This Court has consistently held that Article V, § 3, forbids not only the levying and collecting of a tax for a non-public purpose, but also the appropriation to such purpose of revenues derived from taxes lawfully levied and collected. *Mitchell v. Financing Authority*, 273 N.C. 137, 159 S.E. 2d 745; *Horner v. Chamber of Commerce*, 231 N. C. 440, 57 S.E. 2d 789.

The act in question appropriates $500,000.00 of revenues derived from taxation for use by the Housing Corporation in paying its expenses of organization and in creating a reserve fund for payment of its bonds and notes. The question is whether the purposes of the General Assembly in creating the Housing Corporation, including those for which it may, under this act, borrow money, are a "public purpose" within the meaning of this constitutional limitation upon the authority of the General Assembly to impose taxes and to spend the revenues derived

therefrom. This Court has said the term "public purpose" as used in Article V, § 3, has a meaning which is not necessarily the same as is given the term in other contexts. In *Briggs v. Raleigh,* 195 N.C. 223, 141 S.E. 597, speaking through Stacy, C. J., a unanimous Court said, "Many objects may be public in the general sense that their attainment will confer a public benefit or promote a public convenience, but not be public in the sense that the taxing power of the State may be used to accomplish them."

In applying the term "public purpose" to fix the limits of the taxing and spending powers, the approach of this Court has been to say what is not, rather than what is within the limits. Thus, in *Briggs v. Raleigh, supra,* this Court said, "The use and benefit must be in common, and not for particular persons, interests or estates." Again, as recently as in *Mitchell v. Financing Authority, supra,* Sharp, J., speaking for the Court, said, "It is clear * * * that for a use to be public its benefits must be in common, and not for particular persons, interests or estates; the ultimate net gain or advantage must be the public's as contradistinguished from that of an individual or private entity." To the same effect is *Horner v. Chamber of Commerce, supra.*

The purpose of the act in question is to assist individuals to acquire houses to be owned privately by them and occupied and used privately by them. The public will have no more right to use, occupy, control or dispose of the houses so acquired than it has to use, occupy, control or dispose of any other private home. To tax Jones, Smith, Black and Green to raise funds with which to assist Brown to buy and own a home is not to tax for a public purpose. It would not be contended otherwise if the purpose were to assist a single individual or family. The public or private nature of the assistance is not affected by the fact that it is to be repeated many times. Each home to be acquired will be a separate, private benefit to a single individual or family. A multiplicity of private benefits does not, *per se,* become a public benefit to be enjoyed by all in common like a public park, school or playground. If the person to be so assisted in acquiring a more desirable or more adequate home were in the upper or even the middle income bracket, the non-public nature of this use of tax revenues would be apparent. The fact that the person to be assisted is in the lower income bracket may

make this use of tax revenues more meritorious, but does **not** convert it into a "public use."

*Wells v. Housing Authority,* 213 N.C. 744, 197 S.E. 693, and other decisions relying thereon, are not controlling in this case. Those cases involved the Housing Authorities Act of 1935, the purpose of which, as was observed in the Wells Case, was "To accomplish 'slum clearance' — to rehabilitate crowded and congested areas in cities and towns where insanitary and other conditions exist conducive to disease and public disorder, menacing the safety and welfare of society." In *Mallard v. Housing Authority,* 221 N.C. 334, 20 S.E. 2d 281, the proposed housing was to be built in rural areas, but the owner of each farm on which a low-rent house was to be built had to contract that he would destroy one insanitary dwelling on his farm or convert it to non-residential use.

The constitutional authority of the State to take by eminent domain for destruction property, the existence and use of which is a substantial menace to the public health and safety, is unquestioned. Thus, slum properties may be acquired by eminent domain, or by negotiation, and the offensive property destroyed. This is a spending of tax revenues for a public purpose. Having removed the offensive condition, the State may, as an incident to this purpose, use the property so acquired or dispose of it subject to reasonable conditions calculated to prevent a recurrence of the menace to the public.

That is not the present case. No slum property is to be taken for destruction by the Housing Corporation. No house or area, now unsanitary or congested or blighted, is to be changed by it. Its purpose begins and ends with providing an individual financial assistance in purchasing or building a house to be owned and used by him as private property. He may or may not now live in a slum area or in an unsanitary house, but, if he does live in such area or house, neither he nor anyone else is required to destroy it. The availability to him of "adequate" housing perhaps tends to lighten the demand for "inadequate" housing, but the possibility that thereby "inadequate" housing will become unprofitable, so that it will eventually stand empty and possibly be destroyed, is too indirect and remote to convert this spending of tax revenues into a spending for a "public purpose."

In *Redevelopment Commission v. Bank,* 252 N.C. 595, 114 S.E. 2d 688, also relied upon by the majority in this case, the proceeding was one to condemn a slum area. It arose under the Urban Redevelopment Law. This Court, speaking through Parker, J., later C. J., observed: "The *primary purpose* of the taking is the eradication of 'blighted areas,' the reconstruction and rehabilitation of such areas and the adaptation of them for uses which will prevent a recurrence of the blighted condition. * * * The sale or transfer to the redeveloper is *merely incidental or collateral* to the primary purpose of the Urban Redevelopment Law." (Emphasis added.)

*In re Housing Authority,* 233 N.C. 649, 65 S.E. 2d 761, and *Housing Authority v. Wooten,* 257 N.C. 358, 126 S.E. 2d 101, also relied upon by the majority in this case, did not decide any question of constitutional law or authority. In the first of these cases, Denny, J., later C. J., speaking for the Court, said: "The respondents do not contend that the proposed project is not needed in the City of Charlotte or that the proposed construction * * * is not in the public interest and necessary for public use. * * * (I)n the hearing below, the respondents challenged the validity of the proceeding on the ground that the petitioner had failed to observe the *statutory requirements* governing such project or projects." (Emphasis added.) The holding of this Court was simply that the statute did not require the application to the Utilities Commission for a certificate of public convenience and necessity, for construction of low-rent dwellings, to describe the property on which the project was to be built.

The *Wooten Case, supra,* was one for condemnation of a site for a low-rent housing project and involved only a motion to strike portions of a further answer filed by the owner of land sought to be condemned. Speaking through Parker, J., later C. J., this Court said: "Respondents state in their brief: 'Respondents contend that by their further answer and defense they have alleged facts which show the Housing Authority of the City of Wilson *has acted in bad faith* in the selection of a site or sites for its housing projects." (Emphasis added.)

Thus the constitutional question which faces us was not raised in these two decisions and it is well established that this Court will not pass upon constitutional questions not raised by the litigants. *Carbide Corp. v. Davis,* 253 N.C. 324, 116 S.E. 2d

792; *State v. Blackwell,* 246 N.C. 642, 99 S.E. 2d 867; *Fox v. Commissioners of Durham,* 244 N.C. 497, 94 S.E. 2d 482. Consequently, these two decisions, sustaining the actions of the Housing Authorities involved therein against attacks on non-constitutional grounds, are not authorities which control or guide us in the decision of the constitutional questions properly before us in the present matter.

The case closest in point is our very recent decision in *Mitchell v. Financing Authority, supra.* There, we held the General Assembly could not, consistently with Article V, § 3, of the Constitution of this State, appropriate tax revenues for the operating expenses of a corporation created by the statute and authorized thereby to build industrial properties for lease to corporations coming into the State to establish industrial plants here. Obviously, the attraction of desirable, new industry to North Carolina would provide benefits to many people, including the creation of new employment opportunities and better wages, as a result of which many persons in the low income bracket could more easily buy or build "adequate" homes of their own and have access to other benefits which accompany improved earnings. Nevertheless, in a carefully prepared, well documented opinion by Justice Sharp, we held the proposed expenditure was for a private, not a public purpose within the meaning of Article V, § 3, of the Constitution of this State. In this respect, I am unable to distinguish an appropriation of tax revenues to aid an individual to acquire a building to house a business which he will own and operate for his exclusive, private benefit from a use of such revenues to enable the same individual, or another less wealthy, to acquire a building which he will use as his own, private residence. The majority opinion seriously undermines, if it does not destroy, the Mitchell Case, which in my opinion was, and still is, a correct application of this provision in the Constitution.

It has been well said that, in considering the constitutionality of a statute, the wisdom of the legislative plan is not before us. It is equally true that the wisdom of a provision in the Constitution is not before us. If the people have written into their Constitution a prohibition upon certain actions by their Legislature, it is not for us or for the Legislature to disregard it because we believe it unwise or out of date, even if we do so regard it.

Martin v. Housing Corp.

Spending policies of the Federal Government are not germane to the issue before us. In the first place, the United States Constitution does not contain a provision such as Article V, § 3, of the State Constitution, though such a limitation may be thought implicit in the Due Process Clause of the Fifth Amendment, or in Article I, § 8, Clause 1. In the second place, even if such a provision were expressed in the United States Constitution in the precise words used in Article V, § 3, of the North Carolina Constitution, neither Congressional appropriation nor approval thereof by the Supreme Court of the United States would compel us to give a like construction to the limitation placed by the North Carolina Constitution upon the Legislature of this State. For the same reason, decisions by the courts of other states, interpreting the provisions of their constitutions, do not have that effect, notwithstanding our great respect for those courts.

Even if the purpose for which the statute before us authorizes the Housing Corporation to act were a "public purpose," the provision purporting to exempt its bonds from taxation is, in my opinion, invalid by reason of Article V, §§ 3 and 5, of the Constitution of North Carolina.

When the proposed bonds are issued and sold to private investors they will not be property of the State, a county or a municipal corporation. They are not property of any type which Article V, § 5, authorizes the Legislature to exempt from taxation.

It is quite clear that when Article V, § 5, provides expressly that certain types of property *shall* be exempt from taxation and certain other types of property *may* be exempted, the necessary conclusion is that the Constitution means that no other type of property may be exempted. This is made even more certain by the express provision in Article V, § 3, that "the power of taxation shall never be surrendered, suspended, or contracted away." It is worthy of remembrance that these are not antiquated provisions in our State Constitution, relics of the horse and buggy age. Both § 3 and § 5 of Article V were before the Legislature for rewriting by amendment as recently as 1961 and the people ratified the rewritings in the election of 1962. The revision of the Constitution proposed by the General Assembly of 1969, which is to be voted upon by the people at

the next general election, leaves the pertinent parts of these provisions unchanged. Session Laws of 1969, c. 1258.

The exemption of State, county and municipal bonds from taxation has been held authorized by this Court. *Mecklenburg County v. Insurance Co.*, 210 N.C. 171, 185 S.E. 654; *Pullen v. Corporation Commission*, 152 N.C. 548, 68 S.E. 155. The rationalization of this result is far from convincing but in any event it does not support this statute. The reason for the holding in those cases was that such exemption reduces the interest the State, or its political subdivision, has to pay on its own obligations and so the effect is approximately the same as if the obligation were taxed and the higher interest rate paid. See, the dissenting opinion of Clark, C. J., in the Pullen Case. The statute before us expressly provides that neither the State nor any of its political subdivisions shall be liable for the payment of any bond issued by the Housing Corporation or for the payment of interest thereon.

HIGGINS, J., joins in the dissenting opinion.